No. 24-30684

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

TRAVIS ENCLADE;
TERENCE WILSON,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:22-cr-238-2

**BRIEF FOR APPELLANT TERENCE WILSON**

CLAUDE J. KELLY
Federal Public Defender
Eastern District of Louisiana

CELIA C. RHOADS
Assistant Federal Public Defender

Office of the Federal Public Defender
500 Poydras Street, Suite 318
Hale Boggs Federal Building
New Orleans, Louisiana 70130
(504) 589-7930
celia_rhoads@fd.org

## CERTIFICATE OF INTERESTED PERSONS

*United States v. Wilson*
No. 24-30684

The undersigned counsel of record certifies that the following listed persons

and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the

outcome of this case. These representations are made in order that the judges of this

Court may evaluate possible disqualification or recusal.

1. *Defendant-Appellant:* Terence Wilson.

2. *Counsel for Defendant-Appellant*: Assistant Federal Public Defender Celia C. Rhoads.

3. *Former Counsel for Defendant-Appellant*: Michael G. Respanti, Esq. and former Federal Public Defender Jerrod Thompson-Hicks.

4. *Counsel for Plaintiff-Appellee*: Assistant United States Attorneys Kevin G. Boitmann and Rachal Cassagne.

5. *Former Counsel for Plaintiff-Appellee*: Assistant United States Attorney Andre Jones and former Assistant United States Attorney Christopher Usher.

s/Celia Rhoads<br>
CELIA C. RHOADS<br>
Assistant Federal Public Defender<br>
Dated: January 12, 2026

ii

## REQUEST FOR ORAL ARGUMENT

Appellant Terence Wilson respectfully requests oral argument. This appeal arises from a multi-defendant trial involving a substantial record and numerous, complex evidentiary issues. The arguments raised herein are both substantial and fact intensive. Accordingly, oral argument would aid in this Court's resolution of this appeal.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS .......................................................... ii

REQUEST FOR ORAL ARGUMENT ..................................................................... iii

TABLE OF CONTENTS ......................................................................................... iv

TABLE OF AUTHORITIES ....................................................................................1

STATEMENT OF JURISDICTION ........................................................................4

STATEMENT OF THE ISSUES .............................................................................5

STATEMENT OF THE CASE ................................................................................6

SUMMARY OF THE ARGUMENT ....................................................................39

ARGUMENT ........................................................................................................41

    I.    The evidence was legally insufficient to support each count of conviction. ...........................................................................................41

        A.    Standard of review and sufficiency framework. ........................41

        B.    The government failed to prove the requisite agreement required for a conspiracy conviction (Count 1). .......................42

        C.    The government also failed to prove the requisite possession of the narcotics and firearms found at the Encampment Street house (Counts 2 and 3). ............................48

    II.    A new trial is required because this case was infected by improper law enforcement opinion testimony that ran afoul of numerous evidentiary protections. .....................................................51

        A.    Standard of Review. ..................................................................51

        B.    Officer Brens's subjective interpretation and analysis of the surveillance videos and the jail phone call far exceeded the scope of permissible lay opinion testimony under Rule 701 .............................................................................................52

C.   Officer Brens's repeated references to the "investigation" and facts not rooted in personal knowledge additionally constituted improper investigative "background" testimony that this Court repeatedly has warned is improper. ..................................................................56

D.   Officer Brens provided Rule 702 expert testimony disguised as lay witness testimony. ..........................................59

E.   Officer Brens provided repeated, improper lay identification testimony of both people and nondescript objects—conclusions the jury should have come to on its own. ......................................................................................61

F.   Officer Brens improperly bolstered his impermissible opinion testimony through references to outside evidence and previous legal findings that were unavailable to the jury. ......................................................................................64

G.   This grave, pervasive error affected Mr. Wilson's substantial rights and warrants this Court's correction..............65

III.   Improper remarks by the prosecution during the rebuttal portion of closing argument mandate a new trial as well. ...............................66

A.   Standard of Review...............................................................67

B.   The prosecution made numerous improper remarks that constituted clear and obvious error under longstanding law. ........................................................................................68

C.   These errors affected Mr. Wilson's substantial rights, and this Court should intervene. .....................................................73

IV.   The district court reversibly erred in admitting "other acts" evidence and related officer testimony in violation of Rule 404(b). ..................................................................................................78

A.   Standard of Review...............................................................79

B.   Rule 404(b) Standard. ...........................................................79

C. The district court erred in finding the evidence "intrinsic" and not applying Rule 404(b). ....................................................80

D. In any event, the evidence does not satisfy Rule 404(b) and Beechum...............................................................................83

E. The government's Rule 404(b) notice was defective, which independently barred admissibility of the evidence. ...............................................................................87

V. Cumulative error warrants a new trial.................................................89

VI. Mr. Wilson's § 922(g)(1) conviction is unconstitutional under the Second Amendment and the Commerce Clause. ..........................90

VII. Statement of Adoption .......................................................................92

CONCLUSION ...................................................................................................93

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

CASES

*Anthony v. United States*, 935 A.2d 275 (D.C. 2007).................................68

*Crawford v. Washington*, 541 U.S. 36 (2004) ..................................58

*Darden v. Wainwright*, 477 U.S. 168 (1986)...................................76

*Gradsky v. United States*, 373 F.2d 706 (5th Cir. 1967) ..........................69

*Hall v. United States*, 419 F.2d 582 (5th Cir. 1969)...............................69

*Hirst v. Inverness Hotel Corp.*, 544 F.3d 221 (3d Cir. 2008)......................60

*In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th 256 (5th Cir. 2022) .........59

*Jackson v. Virginia*, 443 U.S. 307 (1979)....................................42

*Piaskowski v. Bett*, 256 F.3d 687 (7th Cir. 2001) ..............................42

*Puckett v. United States*, 556 U.S. 129 (2009) ...............................52

*Scarborough v. United States*, 431 U.S. 563, 575 (1977) ........................92

*States v. Mergerson,* 4 F.3d 337 (5th Cir. 1993) .............................48

*United States v. Alvarez*, 610 F.2d 1250 (5th Cir. 1980)........................43

*United States v. Anchondo-Sandoval*, 910 F.2d 1234 (5th Cir. 1990) ...................67

*United States v. Anderson*, 234 F.3d 706 (5th Cir. 2000)........................62

*United States v. Ayala-Garcia*, 574 F.3d 5 (1st Cir. 2009) ......................76

*United States v. Basey*, 816 F.2d 980 (5th Cir. 1987) ...........................43

*United States v. Beaulieu*, 973 F.3d 354 (5th Cir. 2020).................. 67, 73, 76, 77

*United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) (en banc) ............... passim

*United States v. Bolton*, 908 F.3d 75 (5th Cir. 2018) ..........................67

*United States v. Bonner*, 159 F.4th 338 (5th Cir. 2025) .........................92

*United States v. Bowen*, 818 F.3d 179 (5th Cir. 2016) ..........................71

*United States v. Bowie*, 232 F.3d 923 (D.C. Cir. 2000)..........................81

*United States v. Brown*, 186 F.3d 661 (5th Cir. 1999) ..........................41

*United States v. Brown*, 765 F.3d 278 (3d Cir. 2014) ..........................85

*United States v. Carrillo*, 20 F.3d 617 (5th Cir. 1994).........................57

*United States v. Carrillo,* 660 F.3d 914 (5th Cir. 2011)................................. 87, 88

*United States v. Carter*, 953 F.2d 1449 (5th Cir. 1992) ........................72

*United States v. Casel*, 995 F.2d 1299 (5th Cir. 1993).........................47

*United States v. Churchwell*, 807 F.3d 107 (5th Cir. 2015) ............................. 41, 65

*United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024) .........................91

*United States v. Copeland*, 820 F.3d 809 (5th Cir. 2016) .........................90

*United States v. Davis*, 666 F.2d 195 (5th Cir. 1982)............................ 43, 47

*United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024) .............................91

*United States v. Dorr*, 636 F.2d 117 (5th Cir. 1981)...............................68

*United States v. Earls*, 704 F.3d 466 (7th Cir. 2012) .............................62

1

*United States v. Ebron*, 683 F.3d 105(5th Cir. 2012) ................................................61

*United States v. Espinoza-Seanez*, 862 F.2d 526 (5th Cir. 1988) ...........................43

*United States v. Falcone,* 109 F.2d 579 (2d Cir. 1940) ............................................45

*United States v. Fitzharris*, 633 F.2d 416 (5th Cir. 1980) .......................................44

*United States v. Fortenberry*, 860 F.3d 628 (5th Cir. 1988) ...................................86

*United States v. Freeman,* 730 F.3d 590 (6th Cir. 2013) .........................................55

*United States v. Fuchs*, 467 F.3d 889 (5th Cir. 2006) .............................................42

*United States v. Ganji*, 880 F.3d 760, 768 (5th Cir. 2018) ......................................43

*United States v. Garcia*, 413 F.3d 201 (2d Cir. 2005) .....................................52, 59

*United States v. Garza*, 608 F.2d 659 (5th Cir. 1979) .......................................passim

*United States v. Gibbs*, 72 F. App'x 147 (5th Cir. 2003) .........................................62

*United States v. Gibson*, 875 F.3d 179 (5th Cir. 2017) ...........................................43

*United States v. Grinage*, 390 F.3d 746 (2d Cir. 2004) ..........................................55

*United States v. Gutierrez-Mendez*, 752 F.3d 418 (5th Cir. 2014) .........................82

*United States v. Haines*, 803 F.3d 713 (5th Cir. 2015) ...........................................53

*United States v. Hamann*, 33 F.4th 759 (5th Cir. 2022) ..........................................57

*United States v. Hamie*, 165 F.3d 80 (1st Cir. 1999) ..............................................68

*United States v. Holloway*, 377 F. App'x 383 (5th Cir. 2010) .................................46

*United States v. Houston*, 481 F. App'x 188 (5th Cir. 2012) ..................................90

*United States v. Jackson*, 339 F.3d 349 (5th Cir. 2003) ..........................................79

*United States v. Jackson*, 700 F.2d 181 (5th Cir. 1983) ..........................................42

*United States v. Jackson*, 849 F.3d 540 (3d Cir. 2017) ...........................................56

*United States v. Jett*, 908 F.3d 252 (7th Cir. 2018) .................................................62

*United States v. Jones*, 935 F.3d 266 (5th Cir. 2019) .......................................74, 78

*United States v. Kimble*, 142 F.4th 308 (5th Cir. 2025) ..........................................90

*United States v. Kinchen*, 729 F.3d 466 (5th Cir. 2013) ..........................................79

*United States v. Labarbera*, 581 F.2d 107 (5th Cir. 1978) ......................................90

*United States v. Maltos*, 985 F.2d 743 (5th Cir. 1992) ...........................................44

*United States v. Masha*, 990 F.3d 436 (5th Cir. 2021) ............................................61

*United States v. McCall*, 553 F.3d 821 (5th Cir. 2008) ...........................................52

*United States v. McKnight,* 953 F.2d 898 (5th Cir. 1992) ........................................48

*United States v. Miller*, 673 F.3d 688 (7th Cir. 2012) ......................................84, 85

*United States v. Moreland*, 665 F.3d 137 (5th Cir. 2011) .......................................48

*United States v. Munoz,* 150 F.3d 401 (5th Cir. 1998) .............................................48

*United States v. Natel*, 812 F.2d 937 (5th Cir. 1987) ..............................................47

*United States v. Parker*, 554 F.3d 230 (2d Cir. 2009) .............................................45

*United States v. Posada-Rios,* 158 F.3d 832 (5th Cir. 1998) ...................................47

*United States v. Ragsdale*, 426 F.3d 765 (5th Cir. 2005) ........................................51

*United States v. Ramirez-Velasquez*, 322 F.3d 868 (5th Cir. 2003) .......................74

*United States v. Ramirez-Velasquez*, 322 F.3d 868 (5th Cir. 2023) .......................69

2

*United States v. Riddle*, 103 F.3d 423 (5th Cir. 1997)..............................................53

*United States v. Ridlehuber*, 11 F.3d 516 (5th Cir. 1993) .......................... 80, 82, 83

*United States v. Rivera*, 900 F.2d 1462 (10th Cir. 1990) ...........................................89

*United States v. Rodriguez-Leon*, 756 F.3d 422 (5th Cir. 2014) .............................71

*United States v. Rogers*, 89 F.3d 1326 (7th Cir. 1996)...............................................89

*United States v. Santos*, 201 F.3d 953 (7th Cir. 2000) ..............................................89

*United States v. Seekins*, No. 21-10556, 2022 WL 3644185 (5th Cir. Aug. 24, 2022) .....................................................................................................................92

*United States v. Sharp*, 6 F.4th 573 (5th Cir. 2021), ................................................57

*United States v. Smith*, 804 F.3d 724 (5th Cir. 2015)................................. 80, 84, 85

*United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991) ..........................................75

*United States v. Sumlin*, 489 F.3d 683 (5th Cir. 2007)............................... 80, 81, 82

*United States v. Sutherland*, 656 F.2d 1181 (5th Cir. 1981) ...................................46

*United States v. Toure*, 965 F.3d 393 (5th Cir. 2020) ...............................................90

*United States v. Villasenor,* 894 F.2d 1422 (5th Cir. 1990) ....................................46

*United States v. Walker*, 155 F.3d 180 (3d Cir. 1998).............................................75

*United States v. White*, 569 F.2d 263 (5th Cir. 1978)......................................... 44, 46

*United States v. Williams-Hendricks*, 805 F.2d 496 (5th Cir. 1986).......................47

*United States v. Willis*, 76 F.4th 467 (5th Cir. 2023)......................................... 85, 86

United States v. Yanez Sosa, 513 F.3d 194 (5th Cir. 2008). ....................................51

*United States v. Young*, 470 U.S. 1 (1985) ....................................................... 71, 72

*United States v. Zamora*, 661 F.3d 200 (5th Cir. 201...............................................44

## STATEMENT OF JURISDICTION

This appeal is from the final judgment in a criminal case. The district court had original jurisdiction under 18 U.S.C. § 3231. This Court has appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. Final judgement as to the conviction and sentence in this case was entered on March 18, 2025, and Appellant timely filed a notice of appeal on March 24, 2025. ROA.1884, 1891.

## STATEMENT OF THE ISSUES

(1)    Whether the evidence was sufficient to support each count of conviction;

(2)    Whether the extensive, impermissible opinion testimony by the prosecution's primary witness requires a new trial;

(3)    Whether improper remarks made during the rebuttal portion of the prosecution's closing argument warrant a new trial;

(4)    Whether the district court abused its discretion by allowing the admission of damaging Rule 404(b) evidence;

(5)    Whether the constellation of interrelated trial defects in this case rose to the level of cumulative error, such that a new trial is required; and

(6)    Whether Mr. Wilson's 18 U.S.C. § 922(g)(1) conviction is unconstitutional under the Second Amendment or, alternatively, under the Commerce Clause.

## STATEMENT OF THE CASE

### DEA Taskforce Investigation

This case arose from a narcotics investigation in the New Orleans area, led by Jefferson Parish Sheriff's Officer Steven Brens, who also served on a local Drug Enforcement Administration (DEA) taskforce. ROA.225, 682. In April 2022, the taskforce began investigating Appellants Travis Enclade and Terence Wilson for suspected narcotics activity. ROA.225, 685.

In August 2022, law enforcement installed pole surveillance cameras outside of two New Orleans residences in particular that they believed were associated with Mr. Enclade and Mr. Wilson. ROA.225, 690. Specifically: (1) 4558 Camelot Drive, where Mr. Enclade lived with his girlfriend, ROA.688, and (2) 4235 Hollygrove Street, where Mr. Wilson's father lived, ROA.688.

Through this surveillance, Officer Brens observed two individuals, who he believed to be Mr. Wilson and Mr. Enclade, in and around the two residences. ROA.688-89. The camera footage captured various individuals mingling, coming, and going outside and around the Hollygrove home. *See, e.g.*, Gov't Ex. 2a, 2c (video exhibits). Although Officer Brens did not observe the presence of any narcotics during that surveillance, he later testified that he observed interactions that he thought might be narcotics-related. ROA.697, 701. He also viewed surveillance

6

showing an individual from afar, who he believed to be Mr. Wilson, twice holding a firearm outside the Hollygrove residence. ROA.700-01, ROA.1095.

A month after beginning that surveillance, law enforcement installed a pole camera at a third location, 3511 Encampment Street. ROA.689. Mr. Wilson's friend, Stacia Caston, previously lived at the residence, which, at that point, was still in her name. ROA.919. Ms. Caston later testified that she decided to move elsewhere because she could not afford the rent, and that Mr. Wilson asked if he could take the lease over so he could move his father—who was in poor health—into a more comfortable home. ROA.920. Ms. Caston agreed and moved out on September 1, after which Mr. Wilson began moving various possessions into the home. ROA.920.

For approximately three weeks thereafter, Officer Brens surveilled the Encampment address, observing Mr. Wilson enter the residence several times. ROA.689. The pole camera captured Mr. Wilson bring various items into the home, including a mattress, a TV, and a nondescript, black suitcase full of clothes. ROA.719, 765, 818; *see also* Gov't Ex. 3f (video exhibit). Eventually, Mr. Wilson brought his father from the Hollygrove residence to the Encampment Street home so that he could begin living there. ROA.723. Officer Brens never saw any firearms, narcotics, or narcotics-related items going in or out of the home.

Officer Brens also saw an individual he believed to be Mr. Enclade at the residence on various occasions, sometimes with a key. *See, e.g.*, ROA.710, 711. In

7

one episode—which would later become a disputed topic at trial—the zoomed-out pole camera captured an individual going into the house with a nondescript black bag. ROA.720; Gov't Ex. 3h. Officer Brens later claimed that individual was Mr. Enclade and that the bag was discovered in the home with narcotics inside of it. ROA.720-21.

While this surveillance was occurring, Mr. Wilson twice encountered other law enforcement officers, independent of the task force investigation. First, on August 17, 2022, Mr. Wilson was pulled over in Mississippi by a highway patrolman for traveling 80 miles per hour in a 70-mile-per-hour zone. ROA.863. Mr. Enclade was the passenger in the car. ROA.864-65. The highway patrol officer who conducted the stop smelled burning marijuana and, upon searching the vehicle, located small, user-amounts of narcotics, namely, a small bag of marijuana and a small number of pills. ROA.865. Those narcotics appeared to be for Mr. Wilson's personal use. Indeed, the trooper testified, Mr. Wilson was "obviously" under the influence of marijuana. ROA.867.

Second, in September 2022, Mr. Wilson reached out to a DEA taskforce agent through text message. ROA.874. At the time, Mr. Wilson's friend, who was a narcotics dealer and undercover informant, had recently been murdered. ROA.874. Mr. Wilson texted the task force agent at a number that the friend had provided, "Hit me up. I'm taking over." ROA.874. The agent eventually asked to meet Mr. Wilson

at a Home Depot, purportedly for a narcotics transaction. Mr. Wilson agreed to the meeting, where he was arrested. ROA.884. However, after conducting a search, law enforcement determined that Mr. Wilson did not have any narcotics on his person or in his vehicle. ROA.886-87.

### October 12, 2022, Searches

After approximately two months of surveillance, Officer Brens applied for warrants to search the three residences. ROA.672, 724. The affidavit laid out Officer Brens's suspicion that drug purchases were occurring outside of the Hollygrove house and that narcotics might be stored at the Encampment residence. ROA.795, 826. However, in his warrant application, Agent Brens was transparent that, during his surveillance of the Hollygrove location, he "was unable to see if any type of hand-to-hand transaction took place." ROA.795, 826.

On October 12, 2022, law enforcement executed the warrants. ROA.672. At Mr. Wilson's father's Hollygrove home, officers located a pound of marijuana, a small amount of cocaine, a small amount of heroin, and a 9mm Smith & Wesson rifle. ROA.726. At Mr. Enclade's Camelot home, officers located synthetic marijuana and two firearms. ROA.931. Finally, at the Encampment residence, officers located a relatively large quantity of narcotics, including heroin, fentanyl, and methamphetamine. ROA.737-38, ROA.741, 747, 767-68. Officers also located items they believed to be narcotics-related, including scales with narcotics residue,

9

gloves, a kilo press, a blender, a vacuum sealer, and various plastic bags. ROA.731-37, 756. In addition to the narcotics-related items, officers located two firearms in the Encampment home: (1) A Palmetto pistol, located in a black suitcase in a bedroom, ROA.749, 951; and (2) a Diamondback pistol, located behind the door of a spare bathroom, ROA.758-60, 951. Law enforcement also discovered pictures of Mr. Wilson and mail with his name on it in the house. ROA.762-63.

### Federal Indictment and Pretrial Litigation

On October 27, 2022, Mr. Wilson and Mr. Enclade were federally indicated for narcotics and firearms offenses. ROA.40. That initial indictment was followed by a superseding indictment on August 23, 2024, which charged five total counts, four of which charged Mr. Wilson:

> **Count 1**: Conspiring with Mr. Enclade to distribute and possess with intent to distribute 50 grams or more of methamphetamine, 40 grams or more of fentanyl, and 100 grams or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), and 846;

> **Count 2**: Possessing with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 841(b)(1)(B);

> **Count 3**: Possessing a firearm after having been previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1), namely, the firearms discovered at the Encampment residence; and

> **Count 5**: Possessing firearms in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

ROA.40. Count 4 of the indictment charged Mr. Enclade alone with possessing a firearm after having been previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1), namely, the two firearms found at his Camelot residence. ROA.40.

Before trial, the prosecution filed notice of intent to use evidence of prior conduct, i.e., "Rule 404(b)" evidence. ROA.223. Specifically, the prosecution gave notice of its intent to introduce evidence of the Mississippi traffic stop and the DEA arrest at the Home Depot—describing the incidents and attaching the relevant police reports. The prosecution claimed that the two arrests were "intrinsic" to the drug conspiracy charged in Count 1. ROA.229-31. Alternatively, though, the prosecution argued that the evidence was admissible under § 404(b) to establish knowledge and intent. ROA.233-35. The prosecution's recitation of factual background additionally referenced that Mr. Wilson had been seen with a handgun during surveillance of the Hollygrove residence. However, unlike the Mississippi and DEA arrests, the prosecution did not give notice that it planned to introduce that incident as Rule 404(b) evidence, nor explain why it was extrinsic to the charged conspiracy. ROA.226.

On October 6, defense counsel filed a motion in limine expressing concerns that the prosecution appeared poised to introduce not only evidence of other *narcotics*-related activity, but also prior possessions of *firearms*. ROA.1751. Counsel moved to preclude that evidence, explaining that neither the government's

11

intrinsic evidence argument nor its Rule 404(b) relevance argument about the prior narcotics arrests applied to the discrete and specific possessions of firearms charged in Counts 3 and 5. ROA.1752-54.

As defense counsel noted, the two firearm counts were not alleged to be conspiracies and, unlike the drug conspiracy count, did not extend over the time relevant to the extrinsic evidence that the government sought to introduce. ROA.1752-53. Instead, the charged firearm possession occurred on a discrete date: October 12, 2022, i.e., the date of the search. ROA.1752. The district court denied the defense's motion in limine, ruling that the prior alleged firearm possession was intrinsic to the drug conspiracy with Mr. Enclade. ROA.504-06.

In addition to its motion in limine, the defense also filed a motion to dismiss Mr. Wilson's § 922(g)(1) charge on the ground that the statute is unconstitutional under the Second Amendment, both facially and as applied to him. ROA.251. The district court denied that motion as well. ROA.1761.

### Opening Statements

On October 7, 2024, Mr. Enclade and Mr. Wilson proceeded to trial. ROA.319, 484. In her opening statement, the prosecutor told the jury that they would learn about how Mr. Enclade and Mr. Wilson conspired to use the Encampment Street house as their "drug factory" and that "they were working together in their drug trafficking activities." ROA.667. The prosecutor urged that Mr. Enclade and

12

Mr. Wilson "worked together in every step of this process"—that they "conspired together as partners in this crime." ROA.667-68. That conspiracy would be evidenced, the prosecutor promised, by "video footage of them together conducting hand-to-hand transactions with drug customers," "a jail call where they talk about the location of their narcotics," and "a traffic stop where they're found with drugs in the car." ROA.667-68. The prosecutor further promised that the evidence would show that Mr. Wilson and Mr. Enclade "jointly possessed" both the drugs and the guns in "their stash house," i.e., the Encampment Street residence. ROA.668.

Central to this presentation, the prosecutor promised, would be Officer Brens, "a DEA task force officer with 30 years in law enforcement." ROA.669. The prosecutor assured jurors that Officer Brens would explain to them how his investigation "let him to identify Mr. Wilson and Mr. Enclade as drug dealers" and that "he observed several behaviors consistent with drug dealing" during his surveillance. ROA.669. The prosecutor promised that Officer Brens would walk the jury through that surveillance:

> You'll see video footage of Mr. Wilson and Mr. Enclade conspiring together at a house on Hollygrove Drive. They would hang out on the front porch, a customer would arrive, make a quick hand-to-hand exchange, and the customer would leave quickly. Officer Brens will tell you that a quick exchange like this and the frequency of these types of exchanges is indicative that it was a drug deal.

ROA.669.

13

The prosector further promised that Officer Brens would explain other hallmarks of drug dealers as well, such as practices with phone numbers and vehicles—"efforts to avoid law enforcement." ROA.670. Officer Brens would also explain, the prosecutor noted, that when Mr. Enclade or Mr. Wilson went into their houses "quickly," it was "indicative of narcotics transaction[s]" because drug dealers go into their houses "quickly get the drugs, and then going somewhere else to distribute it." ROA.671-72. This would culminate, the prosecutor previewed, with "federal search warrants." ROA.672. "And just as law enforcement anticipated, and just as this investigation was pointing to and demonstrating, hidden in that nice neighborhood, that stash house was full of guns and drugs." ROA.672.

**Testimony of Officer Steven Brens**

As the prosecution promised, Officer Brens was its star witness—providing almost all the prosecution's evidence. ROA.682-833. In fact, in the prosecution's brief day-and-a-half presentation of testimony, Officer Brens's testimony took almost the entirety of the first day, dwarfing the testimony of the other, relatively minor fact witnesses. At prosecution prompting, Officer Brens began his testimony by describing his 30 years of law enforcement experience in detail, explaining that he had conducted "over 100, close to 200 or more narcotics investigations." ROA.682-83. Officer Brens and the prosecutor would later call upon that "experience" repeatedly to explain and interpret evidence for the jury. *See, e.g.,*

14

ROA.686, 687, 700, 716, 732, 733, 734, 739, 744, 750, 756, 760, 768, 787, 788, 790, 797.

Central to his testimony was Officer Brens extensive narration of a handful of surveillance videos at the three residences at issue. Officer Brens repeatedly identified individuals in that surveillance as the defendants, even when surveillance was taken so far away that no face was visible, or when the camera's view was partially obscured. ROA.692-724; *see also* Gov't Ex. 1a-b, 2a, 2c, 3b-i. (video exhibits). Officer Brens asserted that he was qualified to make those identifications because he was "familiar" with how Mr. Wilson and Mr. Enclade looked "[t]hrough physical surveillance, photographs, pole camera surveillance, and through interview." ROA.695. He also claimed to be "familiar with" Mr. Enclade's "body language and the way he walks." ROA.696. This was a critical claim, because surveillance footage often was too far away or obscured for anyone watching to make out various individuals' faces. *See, e.g.*, ROA.1092, 1093, 1095, 1097 (screenshots of the surveillance).

*Alleged "Hand-to-Hand Transactions"*

From three months of surveillance, the prosecution selected a small handful of video clips to show the jury, with Officer Brens claiming that three in particular depicted drug transactions. ROA.697, 699, 701; Govt' Ex. 1b, 2a, 2c (video

15

exhibits). Those videos—narrated extensively by Officer Brens—proved central at trial and were disputed by the defense.

First, the prosecution played a pole camera video taken from outside of Mr. Enclade's Camelot Street residence on August 18, 2022. ROA.697-99; Gov't Ex. 1b (video exhibit). The video showed an individual—whose face was largely obscured—retrieving multiple objects from a parked car, including a hat, which he placed on his head:





Gov't Ex. 1b at 00:04, 00:14.

Though it was not possible to know what was in the individual's hand, the prosecution asked Officer Brens nonetheless: "Can you describe what Mr. Enclade is holding?" ROA.697. Officer Brens responded, "He looks like he's holding a package of narcotics." ROA.697. When asked to explain his opinion on the matter, Officer Brens testified:

> It's based on the activity that I observed, and also the appearance of the item in his left hand. It appears to be packaged in a clear plastic bag. Also, the nature of the meeting of him leaning into the vehicle so he's not to be seen from the exterior. The windows on this vehicle are – I'm not an expert on it, but it's like limo type tint, so you couldn't see it through the back window or anything to zoom in on that.

ROA.697. Officer Brens, at prosecution prompting, agreed that this was just "an example" of what he had observed at the residence—suggesting there was more evidence out there that the jury was not seeing, including other hand-to-hand drug transactions. ROA.698.

Counsel for Mr. Enclade pressed Officer Brens about this claim on cross examination, asking "And you're just speculating when you say that you believe the bag contained drugs. . . . That's just speculation, isn't it?" ROA.777. Officer Brens doubled down, explaining that his "investigation" and his law enforcement experience made him confident that the bag contained narcotics:

> No, I think my observations, and the circumstances in the investigation of this case, and my familiarity with them, and how a drug trafficking

17

organization operates, and as well as the location, I believed those items were in that location for the purposes as I stated.

ROA.777.

Under questioning by Mr. Wilson's attorney, Officer Brens admitted that "he got in the vehicle, so you can't actually see the actual hand-to-hand," but insisted that a hand-to-hand had occurred nonetheless, claiming, "that's, in my experience, and the drug narcotics traffickers, the subject that's purchasing the narcotics will enter the vehicle for a very short period of time in order to grab it -- to grab the narcotics and exchange the currency for the narcotics. But, in addition, they don't want to expose themselves to the public on the outside." ROA.787. In other words, Officer Brens claimed—in circular fashion—that the reason the jury could not actually see any hand-to-hand was because hand-to-hand transactions are usually hidden, and, because this activity was hidden, it therefore must be a hand-to-hand transaction. "[T]his is textbook," Officer Brens insisted. ROA.788.

Next, Officer Brens walked the jury through pole camera footage taken outside of Mr. Wilson's father's Hollygrove Street home on August 25, 2022. ROA.698; *see also* Gov't Ex. 2a (video exhibit). The clip showed three individuals socializing around a black pickup truck, again, their faces largely obscured, when a white pickup truck pulled up. A man in a work uniform exited the white truck holding a gray or black cell phone to his ear:

18



Gov't Ex. 2a at 00:14.

Although the man appeared to begin to walk in the direction of the three men, the camera suddenly zoomed out, with the view remaining obscured for much of the interaction:



*Id*. at 00:28. When the camera readjusted, the man in the work uniform could be seen briefly standing by the truck, but the camera's operator quickly panned away to

zoom in on the white truck's license plate, where it remained until the man returned to his car:





*Id.* at 00:40, 01:03. Though impossible to make out, it appeared the man again had a gray or black object in his hand upon returning to the car. *Id.*

Like the previous interaction, the prosecution asked Officer Brens: "Who do you see in this video?" ROA.696. Officer Brens responded: "I see Travis [Enclade]

wearing a red T-shirt [i.e., the individual whose face was fully obscured], Brandon Tillman wearing a black T-shirt, and another individual that lived on Hollygrove Street. He's a male subject with a white T-shirt." ROA.698-99. Officer Brens also claimed: "[I]inside the vehicle is Mr. Wilson." ROA.699. Though the video showed no person in the vehicle at all, Officer Brens claimed that he had seen Mr. Wilson get into the vehicle in earlier pole camera footage not shown to the jury, as well as get out of the vehicle in later footage, also not shown to the jury.

The prosecution then asked Officer Brens: "Can you describe what's happening here with this car?" Officer Brens opined to the jury that this too was a hand-to-hand narcotics transaction:

> A. [The man in the work uniform] walked over to the driver's seat of the Ford Ranger very quickly, and then came back and he appeared to be cupping something in his right hand when he gets back into the Nissan Titan.
>
> Q. Based on the timing of this meeting and your investigation, what do you believe just happened?
>
> A. I believe it was indicative of a narcotics transaction given the area and my investigation in this case.

ROA.699. In other words, Officer Brens suggested that he knew this was a narcotics transaction based on the investigation into the defendants for narcotics trafficking.

The prosecution then showed a still photograph, which Officer Brens testified was a screen capture of the pole camera video taken 17 minutes later. ROA.700. The

21

photograph showed the back of an individual—his face fully obscured—holding a blurry object, which appeared to be the shape of a firearm:



ROA.1095 (Gov't Ex. 2b). Officer Brens told the jury: "That's Mr. Wilson as he exits the Ford Ranger and he's carrying a black semi-automatic handgun." ROA.700. At prosecution prompting, Officer Brens explained to the jury that in his "experience" it is "common for drug dealers to carry firearms," "[f]or protection of their amount of money that they carry, their narcotics, from competition, or other people that may have a beef with them." ROA.700.

On cross examination, Officer Brens admitted that this was not the only time the man in the white Titan had showed up at the Hollygrove house—meaning, he was seen with the defendants on several other occasions as well and this was not the

22

isolated interaction that Officer Brens had implied it was. ROA.790. But *this* time, Officer Brens insisted, the man in the white Titan was purchasing drugs: "In my investigation, in my opinion, my experience, yes. And my -- me knowing the area, I believe it was a narcotics transaction given the amount of time that was spent there and the furtive movements." ROA.790.

Finally, the prosecution showed a third video taken outside of the Hollygrove house, during which an unknown person in a white car dropped something off at the Hollygrove house. ROA.700. Officer Brens yet again claimed to be confident that this too was a drug-related transaction. ROA.701; *see also* Gov't Ex. 2c (video exhibit). An induvial—whose face was obscured but who Officer Brens identified as Mr. Wilson—approached the white car and took a large object from the driver:





Gov't Ex. 2c at 00:37.

Despite its fundamentally different size, shape, and appearance than the other two objects that Officer Brens previously identified with great certainty as narcotics, Officer Brens opined that this object too was narcotics—or perhaps, in the alternative, "currency," telling the jury: "Mr. Wilson reached into the vehicle that pulled up and grabbed something that I believe was suspected narcotics or U.S. currency and then walked right back to the porch." ROA.701.

On cross examination, Officer Brens continued to insist that the contents of the bag were "definitely" either "currency or narcotics," again claiming that the "circumstances of this investigation" confirmed that to be true:

> Q. But it's definitely one or the other, though. You just don't know which one it is?
>
> A. That's my testimony.
>
> Q. Okay. And that's based off of this picture?

A. It's not just based off the photograph. It's based off of my investigation, and the area, and the amount of time that the two individuals met, and then he goes right into the house with it.

Q. So if somebody pulls up in a car, hands somebody a bag, and they swiftly walk into a house with that bag, that's indicative of a narcotics transaction, with nothing else?

A. No. I think given the circumstances of this investigation, and my experience in this investigation and other investigations, in this particular incident, I believe was a transaction.

ROA.797.

Officer Brens claimed that Mr. Wilson could be seen with a specific firearm that later would be recovered during the October search of the Hollygrove house, explaining to the jury: "This is Mr. Wilson placing a black semi-automatic handgun in his waistband, and he's carrying -- it looks like a white plastic bag into the residence." ROA.701.



Gov't Ex. 2c at 3:05.

Later in his testimony, the prosecution asked Officer Brens to examine the Smith & Wesson seized from the Hollygrove house three months later, during the

October 12 search. ROA.702; ROA.1106 (physical exhibit of gun seized). The defense objected to this line of testimony, noting again that this firearm was not the one that Mr. Wilson was charged with and therefore was irrelevant. ROA.703. In response, the prosecutor urged: "It appears to be the same firearm as what he's holding in those videos we just saw, and it's in the residence where it was. We think it goes to conspiracy." ROA.703. The defense noted, of course, that one could not possibly know that it was the same gun based on the footage shown, at which point the prosecutor admitted: "[W]e can't definitively say it's the same gun." ROA.704. Although initially agreeing that this claim lacked foundation, the court permitted the prosecution to proceed with the line of questioning, inviting the prosecutor to question Officer Brens on his opinion as to whether it was the same firearm. ROA.704.

Thus, the prosecution asked:

Q. Officer Brens, what does this gun appear to be, Exhibit 4, that's in your hand?

A. It appears to be a black compact semi-automatic Smith & Wesson handgun.

Q. Can you hold it up for the jury to see?

A. (Witness complies.)

Q. Does it appear to be the same gun Mr. Wilson is holding in this video?

A. Yes.

26

ROA. 705-06. The defense again objected, but the court overruled. ROA.706.

Throughout his testimony, Officer Brens reiterated that these were just "examples" of the times that he had seen Mr. Wilson and Mr. Enclade together, suggesting that there was more evidence the jury was not seeing that showed their conspiratorial relationship. ROA.706. He assured the jury he observed "behavior consistent with narcotics transactions" "[p]retty much daily." ROA.706. When asked by the prosecution on redirect why he "believe[d]" that these various other interactions were "drug exchanges," Officer Brens explained that the "investigation" made him confident that they were. ROA.822. He expanded, "we" (i.e., the investigation team) had evidence of various drug transactions, though Officer Brens did not say where that information came from, much less, whether that was his own firsthand knowledge. ROA.822.

During redirect examination—after cross examination already had concluded—Officer Brens also claimed for the first time that "some of these people" seen stopping by the Hollygrove house were identified as "drug customers"— information Officer Brens claimed was gleaned from "registration checks" and "traffic stops." ROA.823-24. Though Officer Brens was vague on this point, he claimed that "[o]ne in particular I recall, there was a traffic stop and some drugs were recovered on that individual and he appeared to be a regular customer at Hollygrove." ROA.824. Like the claims about the various hand-to-hand transactions

27

for which no evidence was submitted, it appeared this information was provided to Officer Brens second-hand and was not his first-hand knowledge. Defense counsel objected to this line of testimony, as these new claims were squarely outside the scope of both direct and cross examination. ROA.823-24. The district court overruled defense counsel, who was never able to question Officer Brens on these bare claims.

*Encampment Street Surveillance.*

Officer Brens testified similarly about footage captured at Encampment Street, repeatedly identifying Mr. Wilson and, occasionally, Mr. Enclade, on the footage. For example, Officer Brens narrated for the jury a video in which an individual Officer Brens identified as Mr. Wilson and testified that he was using a black suitcase to carry clothing items into the Encampment home. ROA.718; Gov't Ex. 3f (video exhibit).

Like with the disputed Smith & Wesson firearm, the prosecution asked Officer Brens to provide the jury with his opinion as to whether the bag captured on surveillance footage was the same bag later found in the Encampment home during the October 12 search, with one of the firearms named in Counts 3 and 5 inside. ROA.718.



Gov't Ex. 3f at 00:06; ROA.1138. Officer Brens confirmed to the jury that they were the same. ROA.750.

Similarly, Officer Brens claimed to be able to identify Mr. Enclade, from far away on pole camera video, entering the Encampment home on October 4 with a black bag on the other side of his body:



Gov't Ex. 3h at 01:04; ROA.720. After asking Officer Brens to describe the video for the jury, the prosecution asked: "Did you later find that backpack when you

29

searched the residence?" ROA.721. "Yes," Officer Brens responded, referring to photographic exhibits of a black backpack containing narcotics that was located when Encampment was searched. ROA.721.



ROA.1132-33.

But the prosecution then asked Officer Brens to go even further, asking him to opine for the jury, "[b]ased on [the] investigation, what he thought occurred" once Mr. Enclade was inside the Encampment Street home, and Officer Brens answered:

> A. I think that based on the lack of furniture and my belief that it's a stash location and the amount of time and the backpack that was recovered inside the residence, this was a time that they were processing drugs for resale, packaging, weighing, divvying up for customers.

ROA.771.

Again, on cross examination, Mr. Enclade's attorney pressed Officer Brens on this point, asking: "You said that even based on that blurry video that you know that this is the same backpack that Travis Enclade's seen walking into the house with?" ROA.780. Again, Officer Brens doubled down, claiming that he could tell

the far-off black bag was the same one that was later discovered with narcotics inside. ROA.780-81. When defense counsel pressed further, asking Officer Brens why he was relying on speculation and had not attempted to collect any forensic evidence linking Mr. Enclade to any drug-related objects in the Encampment house, Officer Brens responded: "I wasn't speculating. There was clear evidence that he was going in and out of the house with access to the residence, by himself and with Mr. Wilson. That was not speculation. That's an investigative tool." ROA.785.

*Jefferson Parish Jail Phone Call*

In another contested portion of Officer Brens's testimony, the prosecution asked him to describe and interpret a short portion of a call recorded from the Jefferson Parish Correctional Center in the days after Mr. Wilson's arrest at the Home Depot. ROA.713; Gov't Ex. 5a (audio exhibit). Officer Brens claimed to know the meaning of the content of the conversation. ROA.715-16. In the brief clip, one person could be heard discussing an individual named "Ray" and later referred to something in a cabinet. ROA.716. Officer Brens opined on the meaning of those references, explaining to the jury: "I believe they're talking about some narcotics that were located in the kitchen cabinet under the sink in 3511 Encampment Street." ROA.715. When asked why, he explained:

> Drug traffickers will use terms to speak about narcotics and it's not going to be readily understandable. Like Ray. Ray can be a reference to narcotics, such as girl is a reference to cocaine, and boy is a reference to heroin commonly. Heroin can also be called food or dog food is a

31

common term on the street that is used. It's to -- so that law enforcement, when they're listening to these phone calls, they can't really make out what they're talking about and what the reference is exactly.

ROA.715-16. Officer Brens reasoned: Because Mr. Enclade was later seen at the Encampment house—and because drugs were later found under the sink—the "cabinet" they were referring to must be a reference to where drugs (i.e., "Ray" was stored) and Mr. Wilson must have been providing Mr. Enclade with some sort of drug-related instruction. ROA.717.

When pressed on cross examination, however, Officer Brens admitted that "Ray" was not common slang for narcotics—it was simply his opinion and belief that the term "Ray" must be referring to drugs here. ROA.808.[1] Officer Brens urged:

> A. I mean, it can be two persons that are in a drug trafficking organization can have a specific term that they speak about as to whatever drugs they're discussing between them, and to law enforcement, we wouldn't know exactly what they're talking about. It's only the most common terms that we know, and sometimes we have to ask other agents, "Hey, have you heard this before?"
>
> Q. Okay. But I think you said Ray isn't some common weed vernacular like weed or clear or whatever?
>
> A. No. No.

ROA.808.

---

[1] *See* ROA.808 (Q. He could have said cheeseburgers. Your answer would be the same; right? A. I don't think it would be that. Q. Okay. Is Ray a common drug nickname? A. No . . ." (cleaned up for clarity)).

32

The defense also played a longer version of the call, in which Mr. Wilson provided a specific phone number as contact information for Ray—suggesting he was in fact a person, not drugs. ROA.807; Wilson Ex. 2 (audio exhibit). Officer Brens admitted, "I didn't pick up the entire conversation," but still speculated that this could be a reference to drugs. ROA.807 ("'[G]et his number' can also be a reference of a quantity of narcotics, a price of narcotics.").

*Opinions as to the defendant's guilt.*

Central to Officer Brens's analysis and proffered opinions was a consistent claim throughout his testimony that the "investigation" confirmed that all of the various interactions upon which he opined were drug-related, and, at base, his belief—transparently expressed to the jury—that the evidence against the defendants was overwhelming. In other words, Officer Brens repeatedly engaged in circular logic: Because the "investigation" had confirmed that Mr. Enclade and Mr. Wilson were conspiring to distribute narcotics, these interactions must be evidence of that activity.

For example, on cross examination—when asked why he did not attempt to obtain fingerprint evidence from the guns found at the Encampment house—Officer Brens explained that he did not need such evidence because he already knew the defendants were guilty: "I had my two suspects." ROA.776; *see also* ROA.760-61 ("I had a search warrant for the residence, and I had two suspects that I had been

33

observing going in and out of that residence that I clearly believed to be the targets of the investigation and to have access to this firearm."); ROA.821 (when asked why he did not collect DNA or fingerprints: "I felt confident that I had the right individuals"). The prosecution later emphasized this point, suggesting that the video evidence conclusively showed the defendants' guilt, asking, "When a crime is on video, do you normally get prints or DNA?," to which Officer Brens responded, "No." ROA.821.

Once, at prosecution prompting, Officer Brens highlighted that a judge had found that probable cause supported the warrant to search the three residences, explaining on direct examination:

> Q. Were those search warrants authorized?
>
> A. Yes.
>
> Q. What does that mean?
>
> A. A district court judge of the Eastern District of Louisiana reviewed the affidavit that I submitted, and after reviewing the affidavit that contained probable cause, the judge endorsed the warrants allowing agents to search within a ten-day time window and conduct a full search of each location.

ROA.724-25.

*The Remaining Prosecution Witnesses.*

The remainder of the prosecution's witnesses provided only brief testimony on isolated topics. That included DEA chemists who testified to tests completed on the narcotics recovered at the Encampment house. ROA.834, 846, 852. It also

34

included the highway patrol officer who conducted the Mississippi traffic stop and the DEA taskforce agent who met Mr. Wilson at the Home Depot. ROA.861, 871. Stacia Caston—who recently had moved out of the Encampment home—also testified briefly about the living arrangement there, but she offered no information about narcotics dealing, whether by Mr. Wilson or Mr. Enclade. ROA.917. Beyond Ms. Caston—who confirmed that Mr. Wilson and Mr. Enclade were friends—none of the witnesses spoke to or provided any information about their relationship, much less any coordinated criminal activity. In fact, beyond Ms. Caston, none of the witnesses even knew the two men. Certainly, the prosecution called no suppliers or customers. Nor did the prosecution call any witnesses who could provide evidence relevant to who actually possessed the various items recovered at the Encampment Street house—whether, Mr. Wilson, Mr. Enclade, or someone else.

### Closing Arguments.

In closing, counsel for both defendants highlighted that Officer Brens's testimony was based on pure speculation, particularly his definitive identification of the black backpack and suitcase. ROA.1016, 1024. As counsel noted, numerous black bags could be seen in the evidence photos, any one of which could be the bags seen on surveillance footage. ROA.1019, 1026; *see also* ROA.1159, 1110. Counsel also highlighted the extensive speculation inherent in Officer Brens's opinion testimony regarding the purported drug transactions. *See, e.g.*, ROA.1022.

And counsel urged that the evidence should have been tested to determine who had actually possessed it, rather than simply assuming that both men were guilty of all of the charged crimes because they both had been present at the residence. ROA.1017. Mr. Wilson's counsel also noted other individuals with access to the Encampment residence and the short period of time that the surveillance had occurred, meaning, it did not actually capture who brought various objects into the residence and when.

In rebuttal, the prosecution argued that the lack of forensic evidence was explained by the fact that the defendants were definitively guilty and that law enforcement *knew* they were guilty, rending any forensic testing was unnecessary:

> Part of the argument is that the government didn't fingerprint and DNA swab the evidence in this case. Why not? This was never really a case of who done it. Law enforcement knew who done it on October 12th, 2022, when they went to execute those search warrants.

ROA.1032.

She then highlighted the probable cause finding previously elicited during Officer Brens's testimony, assuring the jury: "The video footage and the other evidence was overwhelming. *It supported probable cause to get the search warrants*." ROA.1032 (emphasis added). She insisted: "On October 12th, the only question was how many drugs were they dealing?" ROA.1032.

The prosecutor also attempted to rebut the defense's observation about the numerous black bags in the residence. Though no witness had testified to the issue,

36

the prosecutor assured the jury that the black object in the photographs was not the bag in question, explaining: "That is a vest from the search team that was there that morning." ROA.1032. The defense immediately objected, nothing that these were not facts in evidence. The court "sustained" the objection, but did not direct the jury to disregard the comment. Immediately thereafter, the prosecution again repeated her claim, telling the jury: "If you zoom in, it appears to be a vest from a search team, not a backpack." ROA.1034. The court did not intervene.

The prosecutor also highlighted Officer Brens's vague testimony—delivered during redirect—about "known drug customers," assuring the jury that the various interactions at Hollygrove were not innocent on that ground. ROA.1024. She told jurors that there were "several transactions by known drug customers, not Uber Eats drivers, but people whose license plates were checked and were known to law enforcement as drug customers." ROA.1034. The prosecution also assured the jury that the largely obscured interactions were not the prosecution's only evidence, explaining "those were only a few. . . . They would stay there for hours on the front porch doing similar transactions." ROA.1034.

**Jury Deliberations and Verdict**

Almost immediately upon beginning their deliberations, the jury sent out a question. Specifically, one of the jurors asked: "Does living in a house with a firearm as a convicted felon constitute possession?" After discussion with the parties, the

district judge simply referred the jury back to a previous instruction on the definition of "possession." ROA.1046.

That night, the jury returned its verdict. With respect to Mr. Wilson, the jury acquitted him of Count 5 (the § 924(c) charge for possession of a firearm in furtherance of drug trafficking). They found him guilty, however, of the remaining three charges, i.e., the drug conspiracy (Count 1), the substantive drug charge arising from the drugs discovered at Encampment (Count 2), and the felon-in-possession-of-a-firearm charge for the two firearms found at Encampment (Count 3). ROA.1786. The jury acquitted Mr. Enclade of § 924(c) count charged in Count 5 as well. They also acquitted him of the substantive drug distribution count charged in Count 2 for which they had found Mr. Wilson guilty. However, the jury found Mr. Enclade guilty of the drug conspiracy and for being a felon in possession of a firearm.

### Sentencing.

On March 18, 2025, the district court sentenced Mr. Wilson to 240 months' imprisonment. ROA.1885.

## SUMMARY OF THE ARGUMENT

This prosecution was riddled with defects and deficiencies that worked independently and in concert to deprive Mr. Wilson of a fair and reliable trial.

First, reversal is required on all counts because the government failed to present evidence proving the elements of each offense beyond a reasonable doubt. Namely, the government failed to prove the requisite agreement necessary for a conviction under Count 1 and the requisite possession necessary for Counts 2 and 3.

If this Court disagrees, numerous trial defects mandate, at the very least, a new trial. Chief among those errors was the prosecution's plainly improper and highly prejudicial presentation of inadmissible opinion testimony through Officer Brens, in clear breach of critical evidentiary protections. This pervasive error infected this trial from start to finish and, ultimately, deprived Mr. Wilson of a fair trial.

A new trial is independently mandated because the prosecutor made repeated improper remarks during the critical rebuttal portion of the government's closing argument. This included arguing facts not in evidence, suggesting that the prosecution had more evidence than it chose to introduce, and invoking the position of the prosecutor to bolster the credibility of its star witness.

The district court also reversibly erred in admitting evidence—in the form of surveillance footage and accompanying improper testimony from Officer Brens—

39

that purported to show Mr. Wilson in possession of a firearm in August 2022. Under Rule 404(b), that evidence was inadmissible. Additionally, the government did not give proper notice.

Even if this Court does not deem each of those errors to independently mandate a new trial, considered in concert, the cumulative effect mandates that result.

Finally, Mr. Wilson's Count 3 conviction for violating 18 U.S.C. § 922(g)(1) must be reversed because the statute independently violates the Second Amendment and the Commerce Clause, both facially and as applied.

## ARGUMENT

**I.     The evidence was legally insufficient to support each count of conviction.**

The evidence as to each count suffered from numerous, fatal defects, requiring reversal by this Court. Most prominently, the prosecution wholly failed to prove the requisite agreement that is central to any conspiracy charge. The prosecution also failed to prove beyond a reasonable doubt Mr. Wilson's possession of the narcotics and firearms that were necessary for convictions as to all three counts. Even under this Court's deferential standard of review applicable to sufficiency challenges, Mr. Wilson is entitled to a judgment of acquittal.

*A. Standard of review and sufficiency framework.*

Counsel below moved for acquittal based on insufficiency of the evidence. *See* ROA.955. Therefore, Mr. Wilson's sufficiency challenges are preserved and this Court's reviewed by this Court is de novo. *United States v. Churchwell*, 807 F.3d 107, 114 (5th Cir. 2015).

"When reviewing a challenge to the sufficiency of the evidence to support a conviction, [this Court] must decide whether a rational jury could find evidence which establishes guilt beyond a reasonable doubt." *United States v. Brown*, 186 F.3d 661, 664 (5th Cir. 1999). Although reasonable inferences may be drawn in the government's favor, courts must consider each inference necessary to prove all elements of the offense, drawing a clear line between reasonable and unreasonable

inferences—especially where the government seeks to prove its case with "conjecture camouflaged as evidence." *Piaskowski v. Bett*, 256 F.3d 687, 693 (7th Cir. 2001); *see also United States v. Jackson*, 700 F.2d 181, 186 (5th Cir. 1983) (explaining that "conviction may not rest on mere conjecture and suspicion"),  To the contrary, even a strong suspicion that someone is involved in criminal activity is no substitute for proof of guilt beyond a reasonable doubt, *Piaskowski*, 256 F.3d at 692, because, a conviction requires a state of near certitude, *see Jackson v. Virginia*, 443 U.S. 307, 315 (1979).

*B. The government failed to prove the requisite agreement required for a conspiracy conviction (Count 1).*

As persuasively explained in Mr. Enclade's opening brief, Count 1 must be reversed because the prosecution failed to prove beyond a reasonable doubt the requisite agreement essential to any conspiracy conviction. *See* Enclade Br. at 15-22. Mr. Wilson adopts those arguments, *see infra* Section VII, and further supplements them with the following additional points.

"To prove the offense of conspiracy to distribute a controlled substance, the government must establish (1) the existence of an agreement between two or more persons to violate narcotics laws, (2) the defendant's knowledge of the conspiracy, and (3) the defendant's voluntary participation in the conspiracy." *United States v. Fuchs*, 467 F.3d 889, 908 (5th Cir. 2006); *see* 21 U.S.C. § 846.

The essence of an § 846 conspiracy is "an agreement to violate the narcotic laws." *United States v. Davis*, 666 F.2d 195, 201 (5th Cir. 1982). Thus, evidence that one—or even both—defendants were involved in narcotics activity is insufficient to secure a conspiracy conviction, because "the crime of conspiracy condemns the agreement itself," not the substantive offense underlying the conspiracy charge. *United States v. Ganji*, 880 F.3d 760, 768 (5th Cir. 2018) (quoting *United States v. Alvarez*, 610 F.2d 1250, 1253-54 (5th Cir. 1980)). "[T]he agreement itself is the criminal act," and, therefore, "[w]ithout an agreement, there is no conspiracy." *Id.* (quoting *Alvarez*, 610 F.2d at 1253-54); *United States v. Basey*, 816 F.2d 980, 1001-02 (5th Cir. 1987) (holding that evidence was sufficient to support defendant's conviction for possession of marijuana but insufficient to support defendant's conviction for conspiracy to possess with intent to distribute).

Critically here, a conspiracy conviction "must rest on sturdier legs than mere inference or supposition." *United States v. Gibson*, 875 F.3d 179, 186 (5th Cir. 2017). Indeed, this Court has "stressed that [it] will not lightly infer a defendant's knowledge and acquiescence in a conspiracy." *Jackson*, 700 F.2d at 185. Moreover, evidence that a defendant "more likely than not" knowingly joined a conspiracy is insufficient for the government to prove its case beyond a reasonable doubt. *United States v. Espinoza-Seanez*, 862 F.2d 526, 538 (5th Cir. 1988).

43

To that end, this Court has made clear that "[a] showing that the defendant merely *associated* with those participating in a conspiracy is insufficient." *Jackson*, 700 F.2d at 185 (emphasis added); *see also United States v. White*, 569 F.2d 263, 268 (5th Cir. 1978) ("[I]t is well-settled that a conspiracy cannot be proven solely by family relationship or other types of close association."); *United States v. Fitzharris*, 633 F.2d 416, 423 (5th Cir. 1980). "Similarly, the government cannot prove a conspiracy by presenting evidence that only places the defendant in 'a climate of activity that reeks of something foul.'" *Jackson*, 700 F.2d at 185. Thus, "it is well established that *mere presence* at the crime scene or *close association with conspirators*, standing alone, will not support an inference of participation in the conspiracy." *United States v. Maltos*, 985 F.2d 743, 746 (5th Cir. 1992) (emphasis added). "If all that is proven . . . is a defendant's mere presence at the crime scene or close association with conspirators, jurors would not be entitled to infer participation in the conspiracy." *United States v. Zamora*, 661 F.3d 200, 209 (5th Cir. 2011). Indeed, selling or possessing drugs oneself and associating with others who also sell drugs does not form a § 846 conspiracy. *Jackson*, 700 F.2d at 185–86 ("At the most, the evidence shows that [the defendant] associated with others who were involved with a conspiracy. That evidence is legally insufficient for a jury to infer, beyond a reasonable doubt, [the defendant's] knowing and voluntary participation in" a conspiracy.).

44

Ultimately, "[t]o be a member of a conspiracy one must, under Judge Learned Hand's classic formulation, in some sense promote [the illegal] venture himself, make it his own, have a stake in its outcome." *United States v. Parker*, 554 F.3d 230, 234 (2d Cir. 2009) (quoting *United States v. Falcone,* 109 F.2d 579, 581 (2d Cir. 1940) (L. Hand, J.))."Accordingly, unless at least two persons have a *shared* purpose or stake in the promotion of an illegal objective, there is no conspiracy." *Parker*, 554 F.3d at 234 (emphasis in original).

The prosecution failed to satisfy these clear tenants of conspiracy law— resting its conviction solely on association, presence, and extensive impermissible speculation by Officer Brens about the nature of the two defendants' activities and their relationship. That was fatal to the conviction. As Mr. Enclade points out, Officer Brens's far-away observations of an individual with a nondescript black bag, his conjecture about the nature of various social interactions on obscured surveillance video, and his baselessly confident interpretation of a brief phone call were simply not sturdy enough legs upon which to rest a conspiracy conviction. In other words, no rational trier of fact could have found a conspiracy beyond a reasonable doubt based on this record and, therefore, both men were entitled to acquittal on Count 1.

Moreover, even if there had been sufficient evidence to show that Mr. Enclade and Mr. Wilson *each* sold drugs, and even if the evidence had shown that they sold

45

drugs near one another, mere parallel drug dealing—even "conscious parallelism"—is never enough. *United States v. Holloway*, 377 F. App'x 383, 387 (5th Cir. 2010) (citation omitted). Indeed, "[d]rug transactions alone do not constitute a conspiracy." *White*, 569 F.2d at 267; *see also id.* ("The government's theory apparently is that Phillip and Claudell were involved in a heroin conspiracy because: (1) Claudell sells heroin; (2) Phillip sells heroin; and (3) they are married. This theory cannot withstand careful scrutiny."); *United States v. Villasenor,* 894 F.2d 1422, 1425-30 (5th Cir. 1990) (holding that, although evidence was sufficient to sustain conviction for possession with intent to distribute drugs, conspiracy conviction required reversal because the evidence did not establish an agreement with any co-conspirators). At best, the prosecution "introduced no evidence of a single conspiracy," *United States v. Sutherland*, 656 F.2d 1181, 1190 (5th Cir. 1981), and instead merely offered scattered evidence of disparate, individualized narcotics activity. In other words, the prosecution failed to prove "a common scheme that united . . . the defendants' actions." *United States v. Jackson*, 978 F.2d 903, 911 (5th Cir. 1992).

Tellingly, the typical evidence that prosecutors generally use to prove drug conspiracies is conspicuously missing in this case. For example, there was no testimony that the defendants purchased drugs on consignment from one another or that they otherwise had a "mutually dependent relationship" when it came to

narcotics trafficking. *United States v. Posada-Rios,* 158 F.3d 832, 860 (5th Cir. 1998). There was not even evidence that they shared drugs or a supplier. There was also no evidence that Mr. Enclade sold narcotics to Mr. Wilson so he could resell them or vice versa, which might have indicated that "each party has a stake in the success of the other's business" and "suggest[ed] a substantial degree of cooperation and partnership." *United States v. Casel*, 995 F.2d 1299, 1306 (5th Cir. 1993) (internal quotation marks and citation omitted). Instead, Mr. Enclade and Mr. Wilson were simply *around* each other often, according to Officer Brens. And, although Offer Brens claimed (without actual trial evidence) that he observed many hand-to-hand transactions at the Hollygrove house, he did not claim that Mr. Enclade and Mr. Wilson engaged in those transactions together.

There was also no testimony that one defendant collected or counted drug money on behalf of the other[2] or that they pooled drugs or drug money,[3] transported drugs for one another,[4] or coordinated drug sales.[5] In fact, the evidence here falls far below even that which this Court previously has found to be *insufficient* to prove a defendant's involvement in a drug conspiracy. In *Untied States v. Holloway*, this Court vacated the defendant's conviction where there at least was evidence that

---

[2] *Compare, e.g., United States v. Natel*, 812 F.2d 937, 941 (5th Cir. 1987).
[3] *See id*.
[4] *Compare, e.g., United States v. Williams-Hendricks*, 805 F.2d 496, 503 (5th Cir. 1986).
[5] *Compare, e.g., United States v. Davis*, 666 F.2d 195, 201 (5th Cir. 1982).

47

alleged co-conspirators *sold drugs directly to the defendant*. 377 F. App'x 383, 387 (5th Cir. 2010) (unpublished).

At base, the prosecution's case for conspiracy was built on the rotten foundation of Officer Brens's extensive speculation and conjecture. But a strong suspicion that someone is involved in criminal activity is no substitute for proof of guilt beyond a reasonable doubt. *Piaskowski*, 256 F.3d at 692, Thus, the evidence was insufficient, and this Court must reverse Mr. Wilson's conviction on Count 1.

C. *The government also failed to prove the requisite possession of the narcotics and firearms found at the Encampment Street house (Counts 2 and 3).*

The prosecution's loose presentation of evidence additionally failed to prove that *Mr. Wilson*—as opposed to Mr. Enclade or someone else—possessed the firearms and narcotics later discovered at the Encampment Street residence.

Counts 2 and 3 required proof that Mr. Wilson "possessed" either the narcotics or firearms discovered at the Encampment Street home. "Possession may be either actual or constructive." *United States v. Moreland*, 665 F.3d 137, 149 (5th Cir. 2011) (citing *States v. Mergerson,* 4 F.3d 337, 348 (5th Cir. 1993)); *United States v. McKnight,* 953 F.2d 898, 901 (5th Cir. 1992). "Actual possession means the defendant knowingly has direct physical control over a thing at a given time." *United States v. Munoz,* 150 F.3d 401, 416 (5th Cir. 1998). The prosecution in this case, however, pursued a theory that Mr. Wilson and Mr. Enclade *jointly and constructively* possessed both the guns and the drugs at Encampment Street. *See,*

48

*e.g.*, ROA.668 ("We believe that the evidence shows Mr. Wilson and Mr. Enclade jointly and constructively possessed the guns and the drugs found in that house."); ROA.1007 ("They worked together, and they jointly and constructively possessed these drugs with the intent to distribute them."); ROA.1014 ("Wilson and Enclade jointly and constructively possessed the guns at the stash house just like they did the drugs.").

Contrary to the government's suggestion at trial, however, it is not enough to merely *know* about an item to "jointly and constructively possess" it. Instead, the government was *also* required to prove that Mr Wilson "knowingly ha[d] both the power *and* the intention, at a given time, to exercise dominion or control over" the drugs and guns at the Encampment Street house. "Possession," § 1.33, 5th Cir. Crim. Instr. (2024). True, "[d]ominion, control, and knowledge, in most cases, may be inferred if a defendant had *exclusive possession* of the place in which the contraband is found[.]" *Moreland*, 665 F.3d at 150 (emphasis added). Critically, though, "this inference cannot be sustained if the defendant *shared joint occupancy* of the place." *Id.* (emphasis added). That is true whether the contraband is out in the open or not. Indeed, even "touching" or other physical contact is not enough alone to show possession. "Possession," § 1.33, 5th Cir. Crim. Instr. (2024).

Again, constructive possession requires the knowing *power and intent* to exercise dominion or control over the thing. Thus, "[w]hen the government seeks to

49

prove constructive possession of contraband found in a jointly occupied location, it must present additional evidence of the defendant's knowing dominion or control of the contraband, besides the mere joint occupancy of the premises, in order to prove the defendant's constructive possession." *Moreland*, 665 at 150.

The prosecution violated those clear requirements in this case: Resting its theory on joint occupancy and knowledge alone by suggesting that both defendants *must* have possessed the drugs and guns in the house because the objects were out in the open and both defendants jointly used the premises. Further, that defect is particularly pronounced as to Mr. Wilson considering the prosecution's theory of the case. Indeed, the prosecution's theory rested on Officer Brens's claim that *Mr. Enclade*—not Mr. Wilson—brought narcotics into the home in the black bag and stored them there. That does not prove that *Mr. Wilson*, even if he jointly occupied and had access to the space, intended to exercise control over those narcotics himself.

\* \* \*

Accordingly, Mr. Wilson's convictions as to Counts 1, 2, and 3 must be reversed.[6]

---

[6] The counts were grouped for sentencing purposes and, therefore, a reversal of any count would require a remand for resentencing as well.

**II.    A new trial is required because this case was infected by improper law enforcement opinion testimony that ran afoul of numerous evidentiary protections.**

The above sufficiency defects mandate reversal. But, if this Court disagrees, numerous trial defects mandate, at the very least, a new trial. Chief among those errors was the prosecution's plainly improper and highly prejudicial presentation of inadmissible opinion testimony through Officer Brens, in clear breach of critical evidentiary protections. This pervasive error infected this trial from start to finish and, ultimately, deprived Mr. Wilson of a fair trial. Even when examined under plain error review, Officer Brens's highly improper testimony requires a new trial.

*A. Standard of Review.*

As described above, some of the errors discussed herein were the subject of objection below, meaning, they are preserved and reviewed for abuse of discretion. *United States v. Yanez Sosa*, 513 F.3d 194, 199 (5th Cir. 2008). This includes, for example, Officer Brens's speculation about the handgun seen with an individual he claimed to be Mr. Wilson. Notably, this Court's "review of evidentiary rulings in criminal trials is heightened." *Id.* at 200 (citations omitted). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Id.* (quoting *United States v. Ragsdale*, 426 F.3d 765, 774 (5th Cir. 2005)). Evidentiary rulings are also subject to harmless-error analysis. "An error is harmless when it does not affect the substantial rights of a

51

party." *United States v. McCall*, 553 F.3d 821, 827 (5th Cir. 2008). "The government has the burden of establishing harmlessness beyond a reasonable doubt." *Id.*

Much of Officer Brens's improper testimony was not objected to below and therefore is subject to plain error review. The plain-error standard consists of four requirements: (1) there must be an error; (2) the error must be "clear or obvious"; (3) "the error must have affected the appellant's substantial rights"; and (4) this Court must decide in its discretion to correct the error because it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Puckett v. United States*, 556 U.S. 129, 135 (2009).

> B. *Officer Brens's subjective interpretation and analysis of the surveillance videos and the jail phone call far exceeded the scope of permissible lay opinion testimony under Rule 701.*

The admission of lay opinion testimony is governed by Federal Rule of Evidence 701. Rule 701 provides that a lay witness is permitted only to give opinion testimony that is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Importantly, "[i]t is the proponent of lay opinion testimony who must satisfy the rule's three foundation requirements" before it may elicit testimony like the kind in this case. *United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005).

52

Rule 701 requires that lay opinion testimony "must be based on personal perception [and] must be [an opinion] that a normal person would form from those perceptions.'" *United States v. Riddle*, 103 F.3d 423, 428 (5th Cir. 1997). The "traditional objective" of the rule is to afford the trier of fact "an accurate reproduction of the event" at issue. Fed. R. Evid., Advisory Committee Notes on 1972 Proposed Rules. As the Second Circuit has explained: "Rule 701 represents no departure from Fed. R. Evid. 602: 'A witness may not testify to a matter until evidence is introduced sufficient to support a finding that the witness had *personal knowledge* of the matter.'" *Garcia*, 413 F.3d at 211 (emphasis added). Moreover, "[t]estimony on topics that the jury is fully capable of determining for itself is not "helpful to clearly understanding the witness's testimony," Fed. R. Evid. 701, and therefore is inadmissible under Rule 701." *United States v. Haines*, 803 F.3d 713, 733 (5th Cir. 2015).

Further, "when an agent relies on the 'entirety' or "totality" of information gathered in an investigation to offer a 'lay opinion,'" that exceeds the proper bounds of Rule 701. *Garcia*, 413 F.3d at 212. Thus, in *Garcia*, the court rejected the government's argument that its agent could opine on the defendant's role in the charged conspiracy because that opinion was not based merely on what *he* personally perceived, but instead was based on the totality of the investigation. *Id.* at 213. Thus,

53

his testimony "was not limited to a summary of his own observations," in violation of Rule 701. *Id.*

Here, Officer Brens was explicit on this point. He repeatedly explained that his opinions of the events in the surveillance videos were not based on what he actually *saw* (indeed, he *couldn't* see what was necessary to render a reliable opinion). Instead, Officer Brens testified, his opinions were based on the "investigation" as a whole. *See, e.g.*, ROA.777, 699, 790, 797, 822, 771. That alone should have been fatal to the testimony's admission.

Similarly, Officer Brens's opinion testimony regarding the Jefferson Parish jail call and the meaning of words used in that call was highly improper. Indeed, this Court has held that testimony nearly identical to that in this case fan afoul of Rule 701:

> [W]hen Lockhart testified to the meaning of common words like "what," "she," "that," and "stuff," he was offering his own interpretation of language that was well within the province of the jury to interpret. The same is true with respect to Lockhart's testimony as to the meaning of pronouns such as "that" and "it," and his testimony that "as soon as I can" was a reference related to heroin. At another point, the government introduced an exchange between Haines and Guyton in which Haines says, "I wanted to bring him that s—t, too" "from last night." Lockhart testified that he "determined that the . . . s—t that [Haines] wanted to bring him back was the heroin that he provided to Marc Guyton on the previous night. Or, the money from that heroin, he wanted to bring that to his heroin supplier when was finished."

*Haines*, 803 F.3d at 734. This Court explained that "[t]his testimony was admitted in error because it went beyond [the agent's] expertise and personal knowledge of

the investigation and instead ventured into speculation, usurping the jury's function, which is to draw its own inferences from the evidence presented." *Id*.

This Court cited favorably to harmonious out-of-circuit cases, including *United States v. Freeman*, in which the Sixth Circuit cautioned that "a lay opinion should not waste time" or "merely tell the jury what result to reach," and that "[a] witness, lay or expert, may not form conclusions for a jury that they are competent to reach on their own." *United States v. Freeman,* 730 F.3d 590, 597 (6th Cir. 2013). The Sixth Circuit warned: "[A] case agent testifying as a lay witness may not explain to the jury what inferences to draw from recorded conversations involving ordinary language." *Id.* at 598. The court held that the agent's testimony was improper because it "effectively spoon-fed his interpretations of the phone calls and the government's theory of the case to the jury, interpreting even ordinary English language." *Id.* at 597.

This Court additionally cited favorably to the Second Circuit's decision in *United States v. Grinage*, 390 F.3d 746, 748-49 (2d Cir. 2004), in which a DEA agent testified that phrases used in recorded phone calls were drug-related "based on [his] knowledge of the entire investigation" and "because of his knowledge of [the defendant's] activities." The court held that this was improper lay opinion testimony because it "usurped the function of the jury to decide what to infer from the content of the calls." *Id.* at 750.

The situation in this case is indistinguishable from those cases. Indeed, Officer Brens admitted that he had no specialized knowledge regarding the meaning of the term "Ray," which was not a well-established narcotics reference. Instead, he only could speculate that the term referred to narcotics based on his own belief about the "investigation." In doing so, he "usurped the function of the jury to decide what to infer from the content of the calls." *Id.* at 750. [7]

In other words, Officer Brens's testimony was based on both speculation and the totality of the investigation—both improper grounds upon which to base lay opinion testimony. Thus, his testimony subverted the function of the jury to interpret the video and audio evidence itself and come to its own conclusions about what that evidence showed—a task that it was perfectly capable of accomplishing without Officer Brens's unhelpful conjecture. Admission of Officer Brens's testimony interpreting the surveillance videos and jail call was clear and obvious error.

C. *Officer Brens's repeated references to the "investigation" and facts not rooted in personal knowledge additionally constituted improper investigative "background" testimony that this Court repeatedly has warned is improper.*

As discussed above, it was impermissible for Officer Brens to base his various opinions on the "investigation" rather than his personal perceptions of evidence

---

[7] *See also, e.g.*, *United States v. Jackson*, 849 F.3d 540, 553 (3d Cir. 2017) ("[L]ay witnesses may provide opinions about their understandings of recorded conversations when to the uninitiated listener, the speaker speaks as if he were using code and the witness's opinions are based upon his direct perception of the event, are not speculative, and are helpful to the determination of a fact." (cleaned up)).

before the jury. Doing so was *also* impermissible, however, because the government is precluded from eliciting such testimony from law enforcement witnesses that incorporates, references, or relies on out-of-court information from non-testifying declarants, including those who provide information throughout the course of an investigation. *See United States v. Hamann*, 33 F.4th 759, 769 (5th Cir. 2022).

"Officers can sometimes provide 'background information to explain the[ir] *actions*' without introducing hearsay." *Id.* (emphasis added) (quoting *United States v. Carrillo*, 20 F.3d 617, 619 (5th Cir. 1994)). But "investigative background" is not an evidentiary exception that allows into trial inculpatory evidence that is otherwise inadmissible. *Id.* (explaining that courts cannot be "misguided by the government's purported desire to give the jury context"). Thus, this Court has repeatedly warned that "[b]ackdooring highly inculpatory hearsay via an explaining-the-investigation rationale is a recurring problem" that district courts must police vigilantly. *United States v. Sharp*, 6 F.4th 573, 582 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 1124 (2022); *see also Hamann*, 33 F.4th at 770.

This recurring problem has a constitutional element as well. "When police officers testify about the contents of witnesses' statements during an investigation, they risk introducing testimonial hearsay evidence." *Hamann*, 33 F.4th at 767. "The Confrontation Clause commands that testimonial evidence be tested 'in the crucible of cross-examination.'" *Id.* at 763-64 (quoting *Crawford v. Washington*, 541 U.S.

36, 61 (2004)). Statements made to police during the course of their investigation, contents of tips, or other information provided by informants or other law enforcement officers are unquestionably "testimonial" and, therefore, having an officer relay the content of those out-of-court statements to the jury violates the Confrontation Clause.

As discussed, Officer Brens repeatedly incorporated information and opinions into his testimony based on what he had gleaned second-hand through the *investigation*, rather than properly limiting his testimony to his first-hand personal perception of events related to the case. That improper testimony included the numerous opinions he offered regarding purported hand-to-hand transactions—explaining to the jury that he knew that they were drug transactions due to what he knew about the defendants through the "investigation." This suggested that Officer Brens had personal, out-of-court knowledge that the jury did not, allowing him to see something the jury would not see, thus bolstering the credibility of *his* personal interpretation of the evidence over the trier of fact. The problem, of course—as this Court has made clear—is this type of testimony permits officers to backdoor information that is not admissible and cannot be tested in court.

Particularly egregious was Officer Brens's eleventh-hour insertion—at prosecution prompting, no less—of the claim that unidentified individuals on the surveillance footage were "known drug customers," and aside which was

unsupported by any trial evidence. Officer Brens even described a specific traffic stop to which no witness testified, meaning, he impermissibly relayed second-hand knowledge through the guise of describing what the "investigation" had found.

This too was clear and obvious error.

### D. Officer Brens provided Rule 702 expert testimony disguised as lay witness testimony.

It is axiomatic that a lay witness may not "testif[y] regarding highly specialized and technical information." *See, e.g.*, *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th 256, 266 (5th Cir. 2022). And a witness whose "interpretation and analysis" of the facts at issue are "the product of 'scientific, technical, or other specialized knowledge,'" must be qualified as an expert. *Id.* at 267 (quoting Fed. R. Evid. 702).

As the Second Circuit has explained: "The purpose of [the expert] foundation requirement is to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements set forth in Fed. R. Crim. P. 16 and Fed. R. Civ. P. 26." *Garcia*, 413 F.3d at 215. In fact, subsection (c) of Rule 701 specifically "was added to 'eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing' and to 'ensure[] that a party will not evade the expert witness disclosure requirements set forth in

59

Fed. R. Civ. P. 26 and Fed. R. Crim. P. 16 by simply calling an expert witness in the guise of a layperson.'*" *Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 227-28 (3d Cir. 2008) (quoting Fed. R. Evid. 701 advisory committee's note). In other words, the purpose of Rule 701(c) is to ensure that parties cannot dodge the protective measures applicable to expert testimony by simply calling a witness as a layperson and then asking that witness to testify as if they had been qualified as an expert.

Thus, law enforcement cannot provide the jury with opinions and analysis of the evidence that is derived from their technical expertise. For example, in *Figueroa-Lopez*, cited with approval in the Advisory Committee's Notes to the 2000 Amendment to Rule 701, the Ninth Circuit held that it was error to allow a non-expert law enforcement witness to testify that a defendant's driving behavior in a parking lot was "countersurveillance driving" consistent with drug trafficking, as that opinion was based on specialized law enforcement knowledge. *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997)

Officer Brens's testimony violated this clear tenant as well, with him opining at length on various benign interactions based on his technical, law enforcement experience. *See, e.g.*, ROA.686, 687, 700, 716, 732, 733, 734, 739, 744, 750, 756, 760, 768, 787, 788, 790, 797. By allowing Officer Brems to testify in this manner, he was able to insert his opinion about the import of otherwise nondescript behaviors, including socializing, talking to someone in a car, owning multiple cars,

and changing one's cell phone number. Because that fell outside the scope of permissible lay witness testimony and instead constituted unnoticed and unqualified expert testimony, admission of Officer Brems's testimony on this point constituted clear and obvious error.

> E. *Officer Brens provided repeated, improper lay identification testimony of both people and nondescript objects—conclusions the jury should have come to on its own.*

Relatedly, when a witness identifies an individual captured in a photo or video footage, it is considered lay opinion testimony. *United States v. Ebron*, 683 F.3d 105, 137 (5th Cir. 2012); *see also United States v. Masha*, 990 F.3d 436, 445 (5th Cir. 2021). When a lay witness provides an opinion regarding an identification, that opinion—like any lay witness testimony—must be "based upon first-hand knowledge or observation" and draw "straightforward conclusions from observations informed by [the witness's] own experience." *Masha*, 990 F.3d at 445 (citations and quotation marks omitted). Thus, "[l]ay witnesses *who know a person* . . . may testify that he is the one shown in the pictures and videotape made by surveillance cameras at banks elsewhere." Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 7.4 (3d ed. 2003) (emphasis added); *see also Ebron*, 683 F.3d at 137.

To satisfy the requirements of Rule 701, this Court has required the government to establish that an identifying witness has personal familiarity with the

individual's appearance *outside of the evidence available to the jury*—otherwise, the identification would not be based on firsthand knowledge, nor would it be "helpful to the jury," which is perfectly capable of analyzing and comparing evidence for itself. *See, e.g.*, *United States v. Anderson*, 234 F.3d 706, 706 (5th Cir. 2000); *e.g.*, *United States v. Gibbs*, 72 F. App'x 147, 148 (5th Cir. 2003) (unpublished).

In contrast, lay opinion identification testimony is *not* admissible when the witness's opinion is based solely on the comparison of photographs or other evidence available to the jury. Indeed, courts have routinely found error in the admission of identification testimony even less tenuous than that provided in this case. For example, in *United States v. Earls*, the Seventh Circuit found error in the admission of identification testimony by officers who identified the defendant as the man depicted in photographs based "solely [on] the comparison of two photographs already in evidence." 704 F.3d 466, 472–73 (7th Cir. 2012). Noting the consistent holdings among circuits that "Rule 701 does not extend so far as to allow a witness to serve as the thirteenth juror and compare two pieces of evidence that are already available to the jury," the court concluded that the testimony was "of dubious value" and should not have been admitted. *Id.* at 473; *see also United States v. Jett*, 908 F.3d 252, 261 (7th Cir. 2018) (finding identification testimony likely inadmissible under Rule 701 when the witness was an agent who testified that the defendant was

the person depicted in surveillance footage based solely on his interaction with him during the execution of the search warrant in that case).

Here, Officer Brens repeatedly claimed to be able to conclusively identify both Mr. Wilson and Mr. Enclade in grainy surveillance video in which the individuals' faces were fully obscured. That was particularly true of the individual bringing the black backpack to the Encampment residence; the claim that Mr. Enclade was present and Mr. Wilson was in the vehicle but could not be seen during the purported Hollygrove hand-to-hand transaction; and the two instances in which Officer Brens claimed that Mr. Wilson possessed a firearm, though the face of the individual at issue was obscured. That was not helpful, first, because it was unreliable, and, second, because the jury was perfectly capable of determining for itself whether there was sufficient basis to conclude whether Mr. Wilson and Mr. Enclade were the individuals shown in those various videos.

What's worse: Officer Brens did not just render opinions about the identification of *people*—he also repeatedly and confidently offered lay opinion testimony conclusively identifying various *objects* that were critical to the prosecution's proof. Stretching the bounds of Rule 701 beyond reasonable limit, Officer Brens testified *extensively* as to his opinion about the identity of various nondescript inanimate objects—repeatedly and conclusively opining that they were the same objects that later would be discovered by law enforcement in their searches.

Most notably, Officer Brens opined that a blurry, nondescript firearm in pole camera footage was the same firearm that was found months later at the Hollygrove residence. He also testified that two nondescript black bags seen with individuals Officer Brens claimed to be Mr. Wilson and Mr. Enclade were the same black bags that later were found in the residence, containing contraband.

This was highly improper. Indeed, Officer Brens's opinions were unreliable and lacked adequate foundation; critically, he was no better positioned than the jury to make those material factual determinations. The surveillance images showing the bags and the comparator photographs taken during the execution of the search warrant were all readily available to the jury for comparison themselves. Thus, Officer Brens usurped the jury's role to come to those critical conclusions on their own.

Officer Brens's identification testimony violated clear and obvious law.

*F. Officer Brens improperly bolstered his impermissible opinion testimony through references to outside evidence and previous legal findings that were unavailable to the jury.*

Finally—and related to the discussion above—Officer Brens repeatedly bolstered his own improper opinion testimony by referencing (1) evidence to which the jury did not have access, (2) his own view that the defendant's were guilty, and, (3) particularly perniciously, a federal judge's prior determination of probable cause.

64

Needless to say, lay witnesses "may not give legal conclusions," particularly about the defendant's ultimate guilt. *United States v. Churchwell*, 807 F.3d 107, 118 (5th Cir. 2015). Nonetheless, Officer Brens did so repeatedly—justifying his various claims to the jury by suggesting that he knew that various activities depicted were nefarious because he already knew the defendants were guilty. Further, Officer Brems highlighted for the jury that there previously had been a finding of probable cause for the search warrant.

At the prosecution's urging, Officer Brens also repeatedly assured the jury that the evidence he described was just the tip of the iceberg. In other words, Officer Brens urged the jury to disregard their own view of the evidence and simply trust him because he (and others) had access to evidence that the jury did not, and thus had already confirmed that the defendants were guilty.

Testimony of this sort is fundamentally at odds with the requirements of a fair trial.

G. *This grave, pervasive error affected Mr. Wilson's substantial rights and warrants this Court's correction.*

Whether considered independently or cumulatively, there can be no doubt that this pervasive error—infecting the testimony of the prosecution's primary witness from start to finish—affected Mr. Wilson's substantial rights. Indeed, Officer Brens's testimony went directly to the question of whether Mr. Wilson and Mr. Enclade were actively working together to coordinate narcotics activities or whether

65

they were merely friends seen around one another. For example, Officer Brens's claim that Mr. Enclade brought the black backpack into the house was the only evidence even remotely suggesting that Mr. Wilson and Mr. Enclade were engaged in a conspiracy there. True of the "Ray" interpretation as well, which permitted the prosecution and Officer Brens both to urge the jury that the call was about coordinating drug activities at Enclade Street, and not about a person named "Ray" as it sounded. Similarly, Officer Brens's testimony put squarely before the jury a claim that Mr. Wilson was someone who possessed firearms—with Officer Brens repeatedly identifying him on blurry surveillance doing so. And, of course, central to Officer Brens's testimony were his claims about the "drug transactions."

In other words, there is at least a reasonable probability that the outcome of the trial would have been different absent this improper testimony. And this Court should exercise its discretion to reverse. Permitting a law enforcement officer to testify in this manner fundamentally deprives a defendant of a fair trial—usurping the fact-finder's role and replacing them with a jury of one.

### III. Improper remarks by the prosecution during the rebuttal portion of closing argument mandate a new trial as well.

Another layer of trial error independently mandates vacating Mr. Wilson's convictions and ordering a new trial. Namely, the prosecutor made repeated improper remarks during the critical rebuttal portion of the government's closing argument. This included arguing facts not in evidence, suggesting that the

66

prosecution had more evidence than it chose to introduce, and invoking the position of the prosecutor to bolster the credibility of its star witness.

## A. Standard of Review.

"Improper comments by a prosecutor may constitute reversible error where the defendant's right to a fair trial is substantially affected." *United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1237 (5th Cir. 1990). This Court applies a two-step analysis to claims of this brand of error. *United States v. Beaulieu*, 973 F.3d 354, 360 (5th Cir. 2020). First, this Court assesses whether "the prosecutor made an improper remark." *Id.* If so, this Court then asks whether the defendant was prejudiced. *Id.*

One of these errors was objected to below, namely, the prosecutor's improper claim that an object believed by the defense to be a black backpack was, in fact, a vest left by the search team. Thus, that error is preserved. The remainder of the errors raised herein, however, were not the subject of objection below. When trial counsel did not object to the prosecution's improper remarks, the appellant must also meet the plain error standard of review, demonstrating clear or obvious error that affected his substantial rights and seriously affected the fairness, integrity or reputation of judicial proceedings. *See United States v. Bolton*, 908 F.3d 75, 94 (5th Cir. 2018).

B. *The prosecution made numerous improper remarks that constituted clear and obvious error under longstanding law.*

During rebuttal, the prosecutor made numerous improper arguments—all of which constituted clear and obvious error. Those improper comments fell into two broad categories of facially impermissible argument.

*First*, the prosecutor referred to facts not in evidence. Unsurprisingly, "[i]t is well settled that in its closing argument the prosecution may not rely on knowledge or evidence unavailable to the jury." *United States v. Hamie*, 165 F.3d 80, 84 (1st Cir. 1999); *see also Anthony v. United States*, 935 A.2d 275, 283 (D.C. 2007) ("It is elementary . . . that counsel may not premise arguments on evidence which has not been admitted." (citation omitted) (alteration in original)). Thus, prosecutors are strictly prohibited from straying beyond the record during closing arguments—meaning, reciting, referring to, or building an argument upon evidence that was not presented at trial. Instead, all facts to which the prosecutor refers must be derived from properly admitted evidence and testimony. *United States v. Dorr*, 636 F.2d 117 (5th Cir. 1981).

That is a critical requirement of any fair trial. As this Court has explained:

> A criminal trial provides a neutral arena for the presentation of evidence upon which alone the jury must base its determination of a defendant's innocence or guilt. Attorneys for both sides, following rules of evidence and procedure designed to protect the neutrality and fairness of the trial, must stage their versions of the truth within that arena. . . . [T]hose things that cannot properly be presented must not be considered at all.

*United States v. Garza*, 608 F.2d 659, 662 (5th Cir. 1979).

This limitation applies to all attorneys, but its limitation on prosecutors is critical. Most obviously, defendants are the holders of constitutional rights at trial and are entitled to be found guilty based only on reliable, admissible evidence that they had a fair opportunity to test. Additionally, though, "[t]he power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says." *Garza,* 608 F.2d at 663. In other words, juries are more likely to credit what prosecutors say because they are prosecutors. *See Hall v. United States*, 419 F.2d 582, 583 (5th Cir. 1969).

Relatedly, this Court long has held—and it is clear and obvious—that a prosecutor may never "suggest that evidence which was not presented at trial provides additional grounds for finding defendant guilty." *Garza*, 608 F.2d at 663 (citing *United States v. Morris*, 568 F.2d at 401; *Hall*, 419 F.2d at 587; *Gradsky v. United States*, 373 F.2d 706, 710 (5th Cir. 1967)).[8] Thus, a prosecutor is strictly prohibited from "assur[ing] the jury that he has much more evidence than he produced at trial." Charles L. Cantrell, Prosecutorial Misconduct: Recognizing Errors in Closing Argument, 26 Am. J. Trial Advoc. 535, 548 (2003). The implication of such improper statements, of course, is that the prosecutor *could have*

---

[8] *See also, e.g., United States v. Ramirez-Velasquez*, 322 F.3d 868, 874 (5th Cir. 2023) ("Equally harmful is the implication that the prosecutor has reached a conclusion based on facts not in evidence."); *Morris*, 568 F.2d at 401 ("This Court has repeatedly held . . . that an attorney may not say anything to the jury implying that evidence supporting the attorney's position exists but has not been introduced in the trial.").

69

produced a mountain of evidence, but that such evidence simply would have been duplicative and a waste of the jury's time. As one commentator has observed, this is an effective (though particularly pernicious) psychological tool because it serves to assure the jury "that a verdict of guilt is beyond question." *Id.* That is particularly true in light of research showing the tremendous and unique level of trust that juries place in prosecutors.

Running afoul of these straightforward limitations not only violates accepted trial norms but also deprives the defendant of the right to cross-examination. A prosecutor who introduces new facts during closing argument "is, in effect, testifying against" the defendant, while directly subverting the defendant's ability to test or rebut those bare claims. Lefevre, § 24.7(e)Prohibited argument, 6 Crim. Proc. § 24.7(e) (4th ed.); *accord, e.g.*, *Garza*, 608 F.2d at 662.As a result, testifying prosecutors deprive the defendant of a right to a fair trial. Thus, this prohibition is both an evidentiary one, as well as a constitutional one.

In this case, the prosecutor referred on multiple occasions to evidence not in the record and repeatedly implied that the prosecution had more proof than it presented, for example:

- Twice instructing the jury—without evidentiary support—that a black object seen in search photos "is a vest from the search team that was there that morning." ROA.1034.

- Telling jurors that there had been "several transactions by known drug customers, not Uber Eats drivers, but people whose license plates were

70

checked and were known to law enforcement as drug customers." ROA.1034.

- Assuring the jury that the evidence it saw was not the prosecution's only evidence of alleged drug transactions, explaining "those were only a few. . . . They would stay there for hours on the front porch doing similar transactions." ROA.1034

In each of these instances, the prosecution violated clear, longstanding precedent.

*Second*, the prosecutor impermissibly bolstered Officer Brens's credibility and testimony, repeatedly suggested that the defendants were obviously guilty, and even referred to a prior probable cause finding by a federal judge as further support for Officer Brens's and the prosecution's view of the defendants' guilt. ROA.1032.

Both the Supreme Court and this Court have long held that "an attorney may not express his personal opinion concerning the merits of the case." *Morris*, 568 F.2d at 401; *see also United States v. Young*, 470 U.S. 1, 18-19 (1985). It is also highly improper for prosecutors to "vouch for" or "bolster" the credibility of its witnesses—especially law enforcement officers—in closing arguments. *Id.*; *see also, e.g.*, *United States v. Rodriguez-Leon*, 756 F.3d 422, 433 (5th Cir. 2014) ("We have repeatedly chastised federal prosecutors for making improper remarks in closing arguments—for example, for 'bolstering' federal agents' credibility in closing arguments[.]"); *United States v. Bowen*, 818 F.3d 179, 191 (5th Cir. 2016) (same). As the Supreme Court has explained:

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused

71

pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*Young*, 470 U.S. at 18-19.

This Court has likewise explained:

[W]e have condemned suggestions that evidence not presented at trial would compel a finding of guilt[], and efforts to create the impression that the government, which possesses a 'vast investigatory network' and whose determinations may both have a stamp of credibility and invoke jurors' loyalty, has already made an extrajudicial determination of guilt. Prosecutors' attempts to vouch for their witness's credibility implicate this concern in both ways: they imply that the prosecutor has additional personal knowledge about the witness and facts that confirm the witness's testimony, and they add to the witness's testimony the influence of the prosecutor's official position.

*United States v. Carter*, 953 F.2d 1449, 1460 (5th Cir. 1992) (citations omitted).

In this case, the prosecutor repeatedly engaged in impermissible bolstering and relayed the view of various government actors that the defendants were guilty— for example, referring to the fact that law enforcement "knew" the defendants had done it:

Part of the argument is that the government didn't fingerprint and DNA swab the evidence in this case. Why not? This was never really a case of who done it. *Law enforcement knew who done it on October 12th, 2022, when they went to execute those search warrants.*

ROA.1032 (emphasis added).

The prosecutor even went so far as to refer to the magistrate judge's probable-cause finding to impermissibly assure the jury that Officer Brens's suspicions about the defendants were correct: "The video footage and the other evidence was overwhelming. *It supported probable cause to get the search warrants*." ROA.1032 (emphasis added). She insisted guilt was pre-determined by that point, claiming: "On October 12th, the only question was how many drugs were they dealing?" ROA.1032. In other words, "[t]his entire line of argument presumed that the whole government apparatus, and the prosecutor individually, had reached a determination of the defendant's guilt before the trial." *Garza*, 608 F.2d at 665.

Thus, these arguments, too, violated clear precedent, and there can be no question that the prosecutor engaged in facially improper argument during rebuttal.

C. *These errors affected Mr. Wilson's substantial rights, and this Court should intervene.*

Needless to say, the first question in this Court's analysis is satisfied: the prosecution did "make an improper remark"—many, in fact. *Beaulieu*, 973 F.3d at 360. And those violations constituted clear and obvious error under longstanding law.

As to the second element of this Court's analysis, Mr. Wilson was prejudiced as a result. And that prejudice satisfies the third requirement of plain error as well, because there is at least "a reasonable probability that, but for [the improper statements], the outcome of the proceeding would have been different[.]" *United*

*States v. Jones*, 935 F.3d 266, 272 (5th Cir. 2019) (internal quotation marks omitted).

That is true whether each statement is considered in isolation or cumulatively. *See*

*Garza*, 608 F.2d at 665 ("While any single statement among those we have isolated

might not be enough to require reversal of the conviction—and, indeed, some clearly

would not—we think it beyond question that the prosecutor's improper comments,

taken as a whole, affected substantial rights of the defendant.").

In examining the prejudice question in this context, this Court considers "(1)

the magnitude of the prejudicial effect of the statements, (2) the efficacy of any

cautionary instructions, and (3) the strength of the evidence of defendant's

guilt." *Id.* (quotation marks omitted). All three counsel for reversal here.

"The magnitude of prejudicial effect is measured by looking at the

prosecutor's remarks in the context of the trial in which they were made and

attempting to elucidate their intended effect." *United States v. Ramirez-Velasquez*,

322 F.3d 868, 875 (5th Cir. 2003) (internal quotation marks omitted). Notably, the

jury in this case already was faced with the impossible task of separating reliable,

admissible evidence from Officer Brens's improper opinion testimony and coming

to its own conclusions about the evidence, rather than simply adopting his. The

prosecution's rebuttal argument muddied the water further—infecting already

defective trial proceedings with more improper evidence and extensive

impermissible opinions as to the defendant's guilt. That made this error both highly

74

improper *and* highly prejudicial. Indeed, "[t]here are instances where a 'single misstep' on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated." *United States v. Solivan*, 937 F.2d 1146, 1150 (6th Cir. 1991). Here, there were numerous, damaging missteps.

The limitations on closing argument discussed above are critical precisely because of the great danger of prejudicial impact. Indeed, "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Walker*, 155 F.3d 180, 184 (3d Cir. 1998). And the errors here were particularly pernicious because the prosecutor's statements suggested to the jury that all of the government actors involved were certain of the defendants' guilt—and that they had come to that conclusion long before trial. Trial, according to the prosecutor, was a mere formality.

This Court has warned that strong and immediate correction is required in these circumstances: "Where there are remarks such as here made the court should, as a minimum, sustain an objection and immediately and clearly instruct the jury that the argument is not supported by evidence." *Hall*, 419 F.2d at 585. Yet, when the Court was put on notice of the prosecutor stating facts not in evidence, the district court sustained the objection but failed to admonish the jury to disregard the

75

statement. Not only that, the court permitted the prosecutor to *immediately repeat* the improper statement in the next breath, without any correction whatsoever.

In fact, there were no curative instructions issued at all, and the district court did nothing to correct the prosecutor's improper statements, beyond reading the generic, non-specific instruction that attorney arguments are not evidence. That was insufficient considering the nature and frequency of the improper statements in this case. *See, e.g.*, *Beaulieu*, 973 F.3d at 361; *see also United States v. Ayala-Garcia*, 574 F.3d 5, 21 (1st Cir. 2009) ("The remarks here called for an instruction explicitly directing the jury to disregard the improper comments.").

Finally, this was not a case in which "[c]losing argument came at the end of several days of trial," after the jury had heard extensive evidence. *Darden v. Wainwright*, 477 U.S. 168, 179 (1986). To the contrary, this was a one-and-a-half-day trial, with the prosecution placing little testimony before the jury beyond Officer Brens's extensive improper testimony. That made closing arguments all the more prominent and critical in the minds of the jurors.

In other words, this was a rare situation in which the prosecution's case rested on the credibility and opinions of a *single witness*—the very witness that the prosecutor's statements improperly bolstered. That witness's testimony was hotly disputed—with the defense veraciously contesting his various interpretations of the evidence and claims about what that evidence showed. Moreover, the prosecution's

76

reference to outside evidence specifically sought to fill holes in its evidence highlighted by the defense, such as the fact that Officer Brens's claims of hand-to-hand transactions were highly speculative, that there was no established link between the defendants and the objects found in the Encampment house, and the case's concerning lack of forensic evidence.

If the jury took the prosecutor at her word, they need not worry that the surveillance did not actually show any drug activity. They need not be concerned that the black backpack or firearms seen in surveillance may not match those later discovered during the search. And they need not concern themselves with the lack of DNA or fingerprint evidence establishing who actually possessed the drugs and guns at the Encampment house. These issues went right to the heart of Mr. Wilson's guilt on all three counts, namely, whether he and Mr. Enclade actually engaged in concerted drug dealing together (Count 1) and whether the evidence stablished that he constructively possessed the contraband found in the house (Counts 1-3).

In other words, the improper statements in this case went to "[t]he crux of the dispute at trial." *Beaulieu*, 973 F.3d at 361. "And on [those] element[s], it's impossible to separate [the prosecution's improper statements] from the other evidence against [Mr. Wilson]." *Id*. As a result, the error here "cast[s] serious doubt on the correctness of the jury's verdict." *Beaulieu*, 973 F.3d at 361. Accordingly, the error here "substantially prejudiced [Mr. Wilson's] right to a fair trial on the

77

evidence presented in his case," *Garza*, 608 F.2d at 661, and there is at least "a reasonable probability that, but for the error, the outcome of the proceeding would have been different," *Jones*, 935 F.3d at 272 (internal quotation marks omitted).

These obvious, prejudicial errors also warrant this Court's correction under the fourth prong of plain error review. Notably, this was not an isolated slip-up. Instead, improper and highly prejudicial remarks pervaded the prosecutor's rebuttal. Those improper remarks bolstered law enforcement testimony that was both integral to a conviction and highly disputed—testimony that the defense adamantly argued was speculative and not credible. The prosecutor also implied that additional evidence and information known to the government corroborated that testimony, and expressed the prosecutors' personal opinions about the evidence and Mr. Wilson's guilt. Not only that, the prosecutor improperly bolstered Officer Brens's already improper conclusions about the defendants' guilt with reference to a prior probable cause determination that never should have been referenced to the jury at all. These serious errors severely undermined the fairness and integrity of Mr. Wilson's criminal trial and generated an unreliable guilty verdict. Accordingly, this Court should exercise its discretion to grant a new trial.

IV. **The district court reversibly erred in admitting "other acts" evidence and related officer testimony in violation of Rule 404(b).**

Next, the district court reversibly erred in admitting evidence—in the form of surveillance footage and accompanying improper testimony from Officer Brens—

78

that purported to show Mr. Wilson in possession of a firearm in August 2022. Under Rule 404(b), that evidence was inadmissible. Additionally, the government did not give proper notice.

### A. Standard of Review.

Mr. Wilson objected to the introduction at trial of any evidence of alleged firearm possession prior to October 12, 2022, including "video or testimonial evidence about WILSON allegedly possessing firearms in August of 2022 at . . . Hollygrove Street." ROA.1751-52. Thus, this issue was preserved.

This Court "review[s] the district court's admission of extrinsic offense evidence over a 404(b) objection under a 'heightened' abuse of discretion standard." *United States v. Jackson*, 339 F.3d 349, 354 (5th Cir. 2003) (citation omitted). "The abuse-of-discretion standard is 'heightened' when evidence is admitted under Federal Rule of Evidence 404(b), because '[e]vidence in criminal trials must be strictly relevant to the particular offense charged.'" *United States v. Kinchen*, 729 F.3d 466, 470 (5th Cir. 2013) (quoting *Jackson*, 339 F.3d at 354).

### B. Rule 404(b) Standard.

Federal Rule of Evidence 404(b)(1) prohibits the admission of evidence of other crimes, wrongs, or acts "to prove the character of a person in order to show that he acted in conformity therewith." However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan,

79

knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). When the government seeks to introduce evidence of an extrinsic crime or act, its "admissibility under Rule 404(b) hinges on whether (1) it is relevant to an issue other than the defendant's character, and (2) it 'possess[es] probative value that is not substantially outweighed by its undue prejudice' under Federal Rule of Evidence 403." *United States v. Smith*, 804 F.3d 724, 735 (5th Cir. 2015) (quoting *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc)).

"Rule 404(b) is designed to guard against the inherent danger that the admission of 'other acts' evidence might lead a jury to convict a defendant not of the charged offense, but instead of an extrinsic offense." *United States v. Sumlin*, 489 F.3d 683, 689 (5th Cir. 2007) (citing *United States v. Ridlehuber*, 11 F.3d 516, 521 (5th Cir. 1993)). "This danger is particularly great where, as here, the extrinsic activity was not the subject of a conviction; the jury may feel that the defendant should be punished for that activity even if he is not guilty of the offense charged." *Beechum*, 582 F.2d at 914.

C. *The district court erred in finding the evidence "intrinsic" and not applying Rule 404(b).*

The "first inquiry" is whether the challenged evidence "is extrinsic or intrinsic," because Rule 404(b) only applies to evidence of "extrinsic" acts. *See*

*Sumlin*, 489 F.3d at 689.[9] "Evidence of an act is intrinsic when it and evidence of the crime charged are inextricably intertwined, or both acts are part of a single criminal episode, or it was a necessary preliminary to the crime charged." *Id.*

The district court ruled that the Hollygrove firearm possession evidence was "intrinsic," and, therefore, outside the purview of Rule 404(b). ROA.504-05. That finding, however, was contingent on "videos showing what the government purports to be evidence of Mr. Wilson selling drugs." ROA.505. The district court specifically concluded that "videos showing Mr. Wilson with a firearm *during the act of selling drugs* shows that the crimes are inexplicably intertwined." *Id.* (emphasis added).

But the government never proved that Mr. Wilson possessed a firearm "during the act of selling drugs" on the dates in question. *See* Fed. R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist."). In other words, the government failed to sufficiently establish that the relevant acts were "inexplicably intertwined" with the drug conspiracy. Thus, the firearm was *not* "intrinsic" to the charged offense.

As explained above, Officer Brens's testimony and the accompanying surveillance footage boiled down to "unfounded suspicion" that drug activity was

---

[9] "Courts have denominated evidence of the same crime 'intrinsic' and evidence of 'other' crimes 'extrinsic.'" *United States v. Bowie*, 232 F.3d 923, 927 (D.C. Cir. 2000).

occurring on those days. *Sumlin*, 489 F.3d at 689. But the "only criminal episode proven" by this evidence was "possession of a firearm by a felon; the rest [was] conjecture and irrelevant." *Id.* at 690. This Court has previously explained that the government must prove a "connection" between "the offense charged in the indictment and evidence of the uncharged offense" for the "other acts" evidence to be considered "intrinsic" and therefore outside the scope of Rule 404(b). *See Ridlehuber*, 11 F.3d at 521. So too here as to whether Mr. Wilson was acting within the scope of the drug conspiracy when he possessed the firearms.

"The problem is that the government did not prove the existence of [drug activity on the days in question]—it did not have sufficient evidence to do so." *Id.* at 522. And when "the evidence adduced at trial d[oes] not prove" a connection, this Court "cannot allow the prosecution's unproven . . . theory [to] dictate what is and is not extrinsic of the charged offense." *Id.*; *see also United States v. Gutierrez-Mendez*, 752 F.3d 418, 423 (5th Cir. 2014) ("[B]ecause prior bad act evidence is only conditionally relevant, we have to ascertain whether the jury was presented with sufficient evidence that the putative bad act actually occurred. If not, then testimony as to it would be irrelevant under Rule 104(b), and it would have been error to admit it."); *Beechum*, 582 F.2d at 913 ("If the proof is insufficient, the judge must exclude the evidence because it is irrelevant.").

Simply put, the government's evidence never proved that Mr. Wilson's firearm possession in August 2022 fell within the scope of the drug conspiracy. Therefore, his firearm possession on those dates was "extrinsic" to the charged drug conspiracy, and the district court erred in finding that Rule 404(b) did not apply. *See Ridlehuber*, 11 F.3d at 521-22.

### D. In any event, the evidence does not satisfy Rule 404(b) and Beechum.

Moreover, the "other acts" evidence did not satisfy the strictures of Rule 404(b) and the two-prong *Beechum* test. As this Court explained in *Beechum*, the test for relevancy under the first prong is the same as that articulated by Federal Rule of Evidence 401, which "deems evidence relevant when it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Beechum*, 582 F.2d at 911 (quoting Fed. R. Evid. 401). "Where the evidence sought to be introduced is an extrinsic offense, its relevance is a function of its similarity to the offense charged." *Id.* The Court made clear, however, that "similarity means more than that the extrinsic and charged offense have a common characteristic." *Id.* "For the purposes of determining relevancy, a fact is similar to another *only when the common characteristic is the significant one for the purpose of the inquiry at hand.*" *Id.* (emphasis added). "Therefore, similarity, and hence relevancy, is determined by the inquiry or issue to which the extrinsic offense is addressed." *Id.*

83

With respect to the second prong, *Beechum* explained that the prejudice analysis must be made "in view of the availability of other means of proof and other facts appropriate for making decision[s] of this kind under Rule 403." 582 F.2d at 914 (quoting the Advisory Committee Notes to Rule 404(b), 28 U.S.C.A. Rules of Evid. at 109 (1975)); *see also id.* at 911 n.14. "Probity in this context is not an absolute[.]" *Id.* at 914. In other words, "[i]t is the incremental probity of the evidence that is to be balanced against its potential for undue prejudice." *Id.*

Here, neither prong of the *Beechum* test was satisfied. As to the first prong—whether the evidence "is relevant to an issue other than the defendant's character," *Smith*, 804 F.3d at 735—the evidence fails the *Beechum* test because (1) Mr. Wilson's firearm possession was not relevant to the drug conspiracy (for the same reasons, explained above, that the evidence was not "intrinsic"); and (2) there is no evidence to suggest that it was one of the firearms charged in the indictment. Thus, the extrinsic act was not relevant to the "inquiry at hand" of whether Mr. Wilson possessed firearms on October 12. *See Beechum*, 582 F.2d at 911.

As the Seventh Circuit pellucidly explained: "If the prior possession was of a different gun, then its value as direct or circumstantial evidence of the charged possession drops and the likelihood that it is being used to show propensity to possess guns rises considerably." *United States v. Miller*, 673 F.3d 688, 695 (7th Cir. 2012). Such is the case here. The fact that Mr. Wilson possessed one firearm in

84

August in front of his father's house does not tend to prove that he possessed entirely different firearms months later at a different location, because "[t]hese are two entirely distinct acts, and participation in one has no relationship to the other." *United States v. Brown*, 765 F.3d 278, 293 (3d Cir. 2014); *accord United States v. Willis*, 76 F.4th 467, 474 (5th Cir. 2023) (explaining that the "possession of *different* firearms at *different* times" are "separate and distinct prohibited acts"). Rather, the only purpose of the evidence is "to show propensity to possess guns," which is precisely what Rule 404(b) prohibits. *Miller*, 673 F.3d at 695.

As to the second prong—whether the evidence "possess[es] probative value that is not substantially outweighed by its undue prejudice," *Smith*, 804 F.3d at 735 (Citation omitted)—the "incremental probity" of the evidence was naught, as explained above, because the firearm Mr. Wilson allegedly possessed in August on Hollygrove Street was *not* one of the firearms he was charged with possessing in October on Encampment Street. On the other hand, the danger of undue prejudice was overwhelming. As this Court cogently observed decades ago in *Beechum*, "[o]ne of the dangers inherent in the admission of extrinsic offense evidence is that the jury may convict the defendant not for the offense charged but for the extrinsic offense." *Beechum*, 582 F.2d at 914. "This danger is particularly great where, as here, the extrinsic activity was not the subject of a conviction; the jury may feel that the

85

defendant should be punished for that activity even if he is not guilty of the offense charged." *Id.*

Here, the "other acts" evidence showed Mr. Wilson appearing to commit a distinct § 922(g)(1) offense that was *uncharged*, involving a different firearm in a different place on a different day from the offense charged in Count 3 of the indictment. *See Willis*, 76 F.4th at 474 (5th Cir. 2023). Thus, its introduction created a "particularly great" "danger" that "the jury may feel that the defendant should be punished for that activity even if he is not guilty of the offense charged" in Count 3. *Beechum*, 582 F.2d at 914.

"Moreover, even if the jury is no more disposed to punish the accused for his unpunished past crimes, over-persuasion may lead them to conclude that, having committed a crime of the type charged, he is likely to repeat it." *Id.* (quotation marks and citation omitted); *see also United States v. Fortenberry*, 860 F.2d 628, 635 (5th Cir. 1988). Here, the government and Officer Brens repeatedly highlighted this "other act" evidence, increasing the undue prejudice. Additionally, because the district court erroneously found that the evidence was "intrinsic" and not within the ambit of Rule 404(b), there was no opportunity for the defense to request a limiting instruction to guard against jury confusion and undue prejudice.

Thus, undue prejudice substantially outweighed any probative value of the evidence.

*E. The government's Rule 404(b) notice was defective, which independently barred admissibility of the evidence.*

The evidence also did not satisfy Rule 404(b) for another, independent reason. The government did not provide proper notice of its intent to introduce evidence and testimony that Mr. Wilson possessed a firearm on August 25 and August 26 on Hollygrove Street. This provides another ground for excluding the evidence. *See* Fed. R. Evid. 404, Commentary to the 1991 amendments ("Because the notice requirement serves as condition precedent to admissibility of 404(b) evidence, the offered evidence is inadmissible if the court decides that the notice requirement has not been met."); *see also United States v. Carrillo,* 660 F.3d 914, 926-28 (5th Cir. 2011). Mr. Wilson objected to the government's defective Rule 404(b) notice. *See* ROA.1753. Thus, this issue is preserved.

Rule 404(b)(3) requires the government to "provide reasonable notice of any such evidence that the prosecutor intends to offer at trial"; "articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose;" and "do so in writing before trial," unless excused for good cause. Fed. R. Evid. 404(b)(3). The government failed to meet these requirements, and the district court therefore erred in not excluding the evidence for lack of proper notice. As explained above, this error stemmed from the district court's misclassification of the evidence as "intrinsic," erroneously placing it outside the reach of Rule 404(b).

The government's "Notice of Intent to Use Evidence" presented and analyzed only two prior acts: (1) an August 17, 2022 arrest; and (2) a September 29, 2022 arrest. *See* ROA.230-31; ROA.233-35. Further, its proffer of supporting evidence related to only those two acts. *See* ROA.225-26 nn.1-2; ROA.237-49 (supporting documents). True, as the district court noted, the government's Notice mentioned additional acts in passing. *See* ROA.505-06; *see also* ROA.301 (government arguing that its Notice "mentioned Wilson's firearm possession while describing the factual background") (emphasis added). But mentioning an act in passing does not constitute "reasonable notice" within the meaning of Rule 404(b), nor did the government "articulate in the notice the permitted purpose for which the prosecutor intend[ed] to offer the evidence and the reasoning that supports the purpose," as the rule requires. Fed. R. Evid. 404(b)(3)(B).

Failure to comply with Rule 404(b)'s notice requirement is an independent defect barring admissibility of "other acts" evidence, as this Court has made clear. *See Carrillo,* 660 F.3d at 928 ("Even if the testimony otherwise satisfied Rule 404(b)'s requirements for admissibility, the government was still required to comply with the notice requirement."). "Given the government's failure to meet that requirement, . . . the district court abused its discretion by allowing" the government to introduce the "other acts" evidence. *Id.*

88

## V.    Cumulative error warrants a new trial.

The numerous pervasive trial errors described herein—and by Mr. Enclade in his opening brief—each independently warrant a new trial. But, even if this Court determines that each of those errors, "if taken in isolation," may have been harmless, "the cumulative effect of trial errors may deprive a defendant of his constitutional right to a fair trial." *United States v. Santos*, 201 F.3d 953, 965 (7th Cir. 2000) (quoting *United States v. Rogers*, 89 F.3d 1326, 1338 (7th Cir. 1996)); *accord Riddle*, 103 F.3d at 435 (finding that "the cumulative effect of the errors" required a new trial, regardless of "whether any one of the errors standing alone would be sufficient to justify reversal").

"[I]n assessing whether a conviction should be upheld despite the presence of error, a court is required to assess the harm done by the errors considered in the aggregate." *Santos*, 201 F.3d at 965 (7th Cir. 2000); *see also United States v. Rivera*, 900 F.2d 1462, 1470–71 (10th Cir. 1990). In this case, numerous, pervasive errors prevented the jury from properly considering and determining whether Mr. Wilson was guilty of each element of each offense charged. Those errors also interfered with his ability to present a lawful, good faith defense to the crimes and for the jury to reach a fair and unbiased verdict, untailed by the undue influence of the testifying law enforcement officer and the prosecution. Indeed, even if this Court deems sufficient the evidence presented at trial against Mr. Wilson, at the very least, "the

89

case was not so completely one-sided against [him] that [this Court] can call the veritable avalanche of errors . . . harmless." *Santos*, 201 F.3d at 965.

Thus, because the cumulative effect of the errors in this case prevented Mr. Wilson from receiving a fair trial, he is entitled to a new trial regardless of whether each independent error would mandate relief on its own. *See, e.g.*, *United States v. Labarbera*, 581 F.2d 107, 110 (5th Cir. 1978) ("The cumulative effect of the errors herein set forth convinces us, however, that the defendant did not receive the fair trial that he is entitled to under the law."); *United States v. Houston*, 481 F. App'x 188, 194-96 (5th Cir. 2012) (reversing where "the errors below cumulatively prejudiced [the defendant's] ability to argue his case to the jury" and the evidence of guilt was not "overwhelming").

## VI. Mr. Wilson's § 922(g)(1) conviction is unconstitutional under the Second Amendment and the Commerce Clause.

Mr. Wilson's conviction for violating 18 U.S.C. § 922(g)(1) must be reversed because the statute independently violates the Second Amendment and the Commerce Clause, both facially and as applied. This Court's review of Mr. Wilson's preserved *Bruen* challenge is *de novo*, *United States v. Copeland*, 820 F.3d 809, 811 (5th Cir. 2016), while his unpreserved Commerce Clause challenge is reviewed for plain error, *United States v. Toure*, 965 F.3d 393, 399 (5th Cir. 2020).

Under *United States v. Kimble*, 142 F.4th 308 (5th Cir. 2025), the district court's reason for denying Mr. Wilson's motion to dismiss on Second Amendment

90

grounds was error, because it relied on a historical analogy *Kimble* rejected. *Compare* 142 F.4th at 312-14, *with* ROA.1768-73. Mr. Wilson anticipates that the government will still argue that *Kimble* forecloses his as-applied challenge, because *Kimble* held that a person with a prior narcotics distribution conviction can be constitutionally disarmed pursuant to a historical tradition of disarming classes of dangerous people. 142 F.4th at 318. In doing so, however, *Kimble* deviated from the *Diaz* framework and relied on historical sources that had already been rejected by the Supreme Court and this Court in *United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024). Accordingly, Mr. Wilson respectfully urges that *Kimble* is not controlling under the rule of orderliness, and, in any event, was wrongly decided. Thus, his conviction should be reversed. If this Court determines that *Kimble* forecloses Mr. Wilson's challenge, however, he seeks to preserves this issue for further review.

Mr. Wilson also seeks to preserve for further review that § 922(g)(1) is facially unconstitutional, which he acknowledges is currently foreclosed by *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024). Respectfully, Mr. Wilson urges that *Diaz* was wrongly decided and that there is no historical support for *permanently* prohibiting firearm possession by all felons.

Recognizing that the issue currently is foreclosed by circuit precedent, Mr. Wilson also raises to preserve for further review that § 922(g)(1) violates the

Commerce Clause, both facially and as applied. *See United States v. Seekins*, No. 21-10556, 2022 WL 3644185, at *2 (5th Cir. Aug. 24, 2022) (unpublished) (summarizing precedent). Numerous judges of this Court have recently called for reconsidering this Court's precedent. *Seekins*, 52 F.4th at 991 (Ho, J., dissenting from denial of rehearing en banc); *United States v. Bonner*, 159 F.4th 338 (5th Cir. 2025) (Willett and Duncan, JJ., concurring). These calls correctly recognize that this Court's prior precedent treating *Scarborough v. United States*—a statutory interpretation case which held that only a "minimal nexus that the firearm have been, at some time, in interstate commerce" is required, 431 U.S. 563, 575 (1977)—as a constitutional decision is irreconcilable with the Supreme Court's post-*Lopez* Commerce Clause jurisprudence. For this independent (though currently foreclosed) reason, Mr. Wilson's § 922(g) conviction should be reversed.

## VII.   Statement of Adoption

Under Fed. R. App. P. 28(i), Mr. Wilson adopts the claims and arguments made in co-appellant Travis Enclade's opening brief. That includes, but is not limited to, arguments related to the insufficiency of the evidence as to each count of conviction, the improper jury instructions, evidence that was improperly admitted, the failure of the court to grant a continuance, and errors related to drug type and quantity calculations at sentencing.

## CONCLUSION

Wherefore, for the foregoing reasons and/or those reasons otherwise apparent to this Court, Terence Wilson respectfully requests that this Court reverse his convictions or vacate and remand for a new trial. In the event this Court reverses one but not all of his convictions, he respectfully asks this Court to remand his case for resentencing.

Respectfully submitted,

s/Celia C. Rhoads
CELIA C. RHOADS
Assistant Federal Public Defender

Office of the Federal Public Defender
Eastern District of Louisiana
500 Poydras Street, Suite 318
Hale Boggs Federal Building
New Orleans, Louisiana 70130
(504) 589-7930
celia_rhoads@fd.org

93

**CERTIFICATE OF SERVICE**

The undersigned certifies that on January 12, 2026, the foregoing Appellant's Brief was filed with the Clerk of Court via the electronic filing system, which will send an electronic Notice of Docket Activity to the following Filing Users:

  Kevin G. Boitmann, kevin.boitmann@usdoj.gov, and
  Rachal Cassagne, rachal.cassagne@usdoj.gov,
    Assistant United States Attorneys.

 "The court's electronic Notice of Docket Activity constitutes service of the filed document on all Filing Users." 5TH CIR. R. 25.2.5.

        s/Celia Rhoads
        CELIA C. RHOADS
        Assistant Federal Public Defender

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that:

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 19,866 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14-point font for text and 12-point font for footnotes.

3.   This brief complies with the privacy redaction requirement of Fed. R. App. P. 25(a)(5), 5th Cir. R. 25.2.13, and Fed. R. Crim. P. 49.1, because it has been redacted of personal data identifiers.

4.   This electronic submission is an exact copy of the paper document, in compliance with 5th Cir. R. 25.2.1.

5.   This brief is free of viruses because it has been scanned for viruses with the most recent version of Symantec Endpoint Protection, in compliance with 5th Cir. ECF Filing Standard A(6).

s/Celia Rhoads
CELIA C. RHOADS
Assistant Federal Public Defender
Dated: January 12, 2026